In re **ROGERS DEVELOPMENT CORP. and Beaverdam Farms, Inc., Debtors.**

**HERITAGE SAVINGS & LOAN ASSOCIATION and Henry Pollard, IV, Substitute Trustee, Plaintiffs,**

v.

**ROGERS DEVELOPMENT CORP. and Beaverdam Farms, Inc., Defendants.**

**Bankruptcy Nos. 79–01532, 79–01533. Adv. No. 79–0003.**

United States Bankruptcy Court, E. D. Virginia.

Feb. 14, 1980.

Daniel M. McCormack, Richmond, Va., for debtors/defendants.

Donald W. Lemons, Richmond, Va., for plaintiffs.

## SUMMARY

BLACKWELL N. SHELLEY, Bankruptcy Judge.

This proceeding involved whether relief from the automatic stay pursuant to § 362 of the Bankruptcy Code should be granted to a secured first mortgage lender in order to foreclose on a large parcel of real estate owned by Debtors in the business of selling and developing real estate. Section 362(d) allows for the granting of the relief from stay if either the debtor cannot provide adequate protection to the creditor or there is no equity in the property for the debtor and the property is not necessary to an effective reorganization. In order to make the determination under § 362(d) the Court decided that the standard of valuation for purposes of this proceeding was at or near the fair market value. In determining whether there was adequate protection, the Court decided that an equity cushion of approximately 15% to 20% was sufficient adequate protection to the creditor; and although the Debtors had no equity in the property, since the property was the only asset of the Debtors and their business was the buying, developing and selling of real estate, it was, therefore, necessary to an effective reorganization. The Court thus denied relief under § 362(d) with leave to the creditor to refile its complaint at any time.

## MEMORANDUM OPINION

BLACKWELL N. SHELLEY, Bankruptcy Judge.

On November 1, 1979, the Debtors filed their petition for relief pursuant to Chapter 11 of the Bankruptcy Code. As a result, the automatic stay provisions of Bankruptcy Code § 362 (11 U.S.C. § 362) became applicable. On November 9, 1979, the Plaintiffs commenced this adversary proceeding by filing two complaints, one against Rogers Development Corp. (Rogers) and one against Beaverdam Farms, Inc. (Beaverdam) in which complaints the Plaintiffs sought relief pursuant to Bankruptcy Code § 362(d)(1) and (2) from the automatic stay. In accordance with the requirements of Bankruptcy Code § 362(e), a preliminary hearing was held on December 6, 1979. At the preliminary hearing a motion was made and subsequently granted that consolidated these two adversary proceedings into this proceeding now before the Court. At the conclusion of the preliminary hearing after hearing evidence *ore tenus* and oral arguments of counsel, the Court requested the parties to submit simultaneous briefs. The briefs were received prior to the final hearing that was held on December 27, 1979 at which the Court heard further evidence *ore*

*tenus* and further oral arguments of counsel. At the end of said hearing additional briefs were requested to be submitted by January 16, 1980. Said briefs having been submitted and upon consideration of the foregoing, the Court renders the following opinion.

## STATEMENT OF THE CASE

The pertinent facts as established by the pleadings, stipulations and the evidence at the hearings are as follows. Rogers and Beaverdam are Virginia corporations which were incorporated on January 18, 1972 and May 17, 1971, respectively. Rogers and Beaverdam (hereinafter referred to as the Debtors) are engaged in the real estate development and home construction business in the Richmond metropolitan area.

In approximately mid 1976 the Debtors formulated a plan for a development of an 89.7, more or less, acre parcel of unimproved property located in Hanover County, Virginia (hereinafter referred to as the Property). The Property was to be developed for single and multi-family dwellings and was to be called The Villages of Beaverdam Park. Rogers owns an undivided 75% interest in the fee simple title to the Property and Beaverdam owns a 25% undivided interest. Pursuant to the loan commitments dated October 26, 1976 made by Heritage Savings & Loan Association (Heritage) to the Debtors, Heritage committed to make a $520,000 acquisition and development loan and a $360,000 line of credit construction loan. These loans were closed simultaneously on December 30, 1976. The notes evidencing these loans were attached to the complaints as exhibits and were introduced into evidence by the Plaintiffs at the preliminary hearing as Plaintiffs' exhibits 2 and 4, respectively. Both of these

notes were secured by deeds of trust also dated December 30, 1976. The acquisition and development loan deed of trust (Plaintiffs' exhibit 3) was recorded as a first lien against the Property and the construction loan deed of trust was recorded as a second lien against the property.[1] In early 1977 the Debtors secured the requisite zoning and other administrative approvals from Hanover County, Virginia and development of the Property commenced. Originally it had been planned that the first phase of development would result in the construction of a 76-lot subdivision on 24 acres. Subsequently, however, it was agreed by Heritage and the Debtors that development would proceed first with the construction of 48 single-family residences or 48 "cluster" or "flag" lots, situated on approximately 10 acres. This is the plan of development that was, in fact, followed, and of the 48 home sites that were to be developed 29 were successfully completed and sold. At the present time there are 13 vacant lots with street access and curbs and 6 lots with partially completed residences under construction. The remainder of the Property is undeveloped.

On April 1, 1978 the Debtors entered into an agreement with its other creditors including suppliers, materialmen and laborers who were due payments of debts incurred in connection with the construction of the improvements. This creditors' agreement was introduced into evidence in Plaintiffs' exhibit 8. Under the creditors' agreement the creditors accepted notes for the amount of not only their past due debts, but also for certain additional credit to be made available to the Debtors in the future. The obligation represented by the creditors' agreement is secured by a third deed of trust against the Property. This deed of trust

---

1. The construction loan was a line of credit loan which actually funded, in part, the repayment of the acquisition and development loan. Construction loan advances were based upon the value of each house constructed on each lot and at the time the first advance was made on a particular house pursuant to the construction loan, $5,500 of the first draw was applied to the unpaid balance of the acquisition and development loan. Heritage would then release the

lien of its acquisition and development loan with respect to that particular lot. Thus with respect to the 6 lots with partially completed houses on them, the construction loan deed of trust constitutes a first lien since the lien of acquisition and development loan has been released. As to the remainder of the Property, the acquisition and development loan deed of trust constitutes a first lien and a construction loan deed of trust constitutes a second lien.

was also introduced into evidence in Plaintiffs' exhibit 8.

Further financial difficulties ensued. In approximately May 1978 the Debtors went into default under the acquisition and development loan. Notwithstanding the default on the acquisition and development loan, advances were made by Heritage under the construction loan and construction at the Property site continued and homes were completed and sold. In approximately July 1979 they went into default on the construction loan. As of the date of the preliminary hearing, the Plaintiffs took the position that the total indebtedness of the Debtors to Heritage was $548,188.41. This amount includes total principal and interest, late charges, appraisal fee, and legal fees. This indebtedness the Plaintiffs contend is increasing as a result of interest continuing to accrue at the rate of approximately $63,000 per year. The Debtors, only for purposes of this proceeding, have accepted the validity of Heritage's figures.

Since the execution of the creditors' agreement (Plaintiffs' exhibit 8), the Debtors have incurred new and additional debts in connection with the construction of homes at the Property. These debts are owed to many of the same creditors who participated in the creditors' agreement and many of these creditors have now filed mechanic's liens totalling $60,301.70 on the Property to which improvements have been added.

The Debtors have admitted only for purposes of this proceeding that their liabilities exceed their assets. This admission would indicate all indebtedness to exceed approximately $1,100,000.

Aside from general background information concerning the Debtors and their relationship with Heritage, the main thrust of both the Debtors' and the Plaintiffs' evidence at the preliminary hearing concerned the present fair market value of the Property. The Plaintiffs introduced their evidence as to value through the testimony of Joseph B. Call, III, who qualified as an expert real estate appraiser who does business in the Richmond area. Mr. Call is the appraiser that Heritage had previously employed in November of 1976 to appraise the Property when the loan commitments were made by Heritage. Mr. Call testified that in his opinion the current fair market value of the Property was $704,200. Ronald E. Martin, also qualified as an expert appraiser of real estate and an appraiser in the Richmond area, testified on behalf of the Debtors that in his opinion the Property had a fair market value of $801,000. The Debtors also introduced testimony of a Mr. Phillip N. Duhamel which indicated that Mr. Duhamel's company, Hanover Craftsman, Incorporated, was currently interested in purchasing some of the Property of the Debtors. The final witness to testify for the Debtors was William D. Bayliss, Esquire. Mr. Bayliss is a member of the creditors' committee appointed by the United States Trustee and was speaking for four of the seven creditors represented on the committee. Mr. Bayliss stated that the creditors' committee strongly opposed the action of Heritage in this proceeding and that the majority of the creditors' committee regards the Property as being essential to the successful reorganization of the Debtors.

## CONCLUSIONS OF LAW

Bankruptcy Code § 362(a) stays any act to enforce a lien against the property of a debtor. Section 362(d) and (g) set forth the grounds for relief from the stay, the procedural aspects of requests for relief, and the allocation of the burden of proof, as follows:

"(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest; or

(2) with respect to a stay of an act against property, if—

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization.

(g) In any hearing under subsection (d) or (e) of this section concerning relief from the stay of any act under subsection (a) of this section—

(1) the party requesting such relief has the burden of proof on the issue of the debtor's equity in property; and

(2) the party opposing such relief has the burden of proof on all other issues."

Heritage has asserted two grounds for relief from the stay. Heritage has alleged a lack of adequate protection of its interest in property, and alternatively that the Debtors do not have equity in the Property and that the Property is not necessary to an effective reorganization.

In considering the issue of adequate protection the Court notes that the phrase "adequate protection" is not defined in § 362 or in any other section of the Bankruptcy Code. Instead § 361 of the Bankruptcy Code offers three non-exclusive methods of providing adequate protection to an entity with an interest in property of the debtor. The method offered in § 361(1) (periodic payments) and in § 361(2) (additional or replacement lien) have not been proposed by the Debtors. The third method, which is contained in § 361(3), is a "catch all", permitting such other means of providing adequate protection "as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property." Although the Debtors contend that they are providing adequate protection pursuant to § 361(3), the Court does not believe that maintenance of the status quo is "granting such other relief" nor is it the "indubitable *equivalent*" (emphasis added) required under that subsection. However, it is the opinion of the Court that a debtor may provide adequate protection by an equity cushion since § 361 does not preclude other forms of adequate protection. The District Court in *In re Blazon Flexible Flyer, Inc.,* 407 F.Supp. 861, 865 (N.D.Ohio 1976) found that a bank was "adequately

protected" despite the bankruptcy judge's order allowing the debtor in possession to use and consume accounts receivable, because of the surplus of security over debt. Further an "adequate cushion" can itself constitute adequate protection with nothing more.[2] *Collier on Bankruptcy*, 15th ed. § 361.02[3] at p. 361–9.

Therefore, since an equity cushion can be adequate protection, the amount of the debt and the value of the property must be determined to establish whether an equity cushion in fact exists. The amount of the debt owing to Heritage from the Debtors has been stipulated for purposes of this proceeding by the parties as $548,188.41. However, the fair market value of the Property is in doubt because of the conflicting evidence of the parties as presented by their respective appraisers. Furthermore, conflict exists on which standard of value, i. e. the liquidation value, the full going concern value, or some value in between, is the proper valuation standard for purposes of this proceeding.

Turning first to the standard of valuation to be used, the Court notes that there is no clear direction to the Court by statute. Therefore, at this juncture, the legislative history of § 361 is important. It reveals a clear intent to not utilize liquidation value in every bankruptcy proceeding. In 1973 the Commission on the Bankruptcy Laws of the United States had recommended that "a benchmark in determining adequate protection is the liquidation value of the collateral at the date of the petition." Commission on the Bankruptcy Laws Report, House of Representatives Document No. 137, 93rd Cong., 1st Session, Part II at 237 (1973). Congress specifically rejected that recommendation. The Senate Report states:

"Neither is it expected that the courts will construe the term value to mean, in every case, forced sale liquidation value or full going concern value. There is wide latitude between those two ex-

---

2. In fact remaining an equity cushion is the purpose of § 361(1) (periodic payments) of the Bankruptcy Code. The periodic payments provided for by this section maintain the equity cushion by compensating for the decrease in value of an entity's interest in the debtor's property.

tremes although forced sale liquidation value will be a minimum.

In any particular case, especially a reorganization case, the determination of which entity should be entitled to the difference between the going concern value and the liquidation value must be based on equitable considerations arising from the facts of the case. Finally, the determination of value is binding only for the purposes of the specific hearing and is not to have a res judicata effect." Senate Report No. 95–989, 95th Cong., 2nd Session (1978), U.S.Code Cong. & Admin. News 1978, pp. 5787, 5840.

The House Report was substantially the same, rejecting liquidation value in every case and leaving the issue to be decided on a case by case basis. House of Representatives, Report No. 595, 95th Cong., 1st Session 339 (1977). Judge Conrad Cyr noted in *In re American Kitchen Foods, Inc.,* 9 C.B.C. 537, 553 (N.D.Me.1976) that "the most commercially reasonable disposition practicable in the circumstances should be the standard of value universally applicable in all cases and at every phase of each case." Further, "the nature of the debtor's business, the prospects for rehabilitation, and the nature of the collateral all enter into the determination of the standards of value to be applied." 2 *Collier on Bankruptcy,* 15th ed. § 361.02.

In this case the collateral is primarily real property which by all testimony is appreciating in value. While there was some evidence that the partially completed houses were suffering some deterioration because of weathering and vandalism, the impact of this deterioration in value loses significance when measured against the value of the Property as a whole. Further, the Court realizes that while there is no guarantee that real property will sell, both appraisers stated that given a commercially reasonable time, the Property should sell at or near the fair market value. The Court finds, therefore, that a standard of valuation approximating the fair market value should be and is the "commercially reasonable" standard required given the circumstances of this case. *In re American Kitchen Foods, Inc., supra.*

Since the standard of valuation for purposes of this proceeding is the fair market value, it is now necessary to determine what is the fair market value of the Property. The parties, Heritage and Rogers, each presented its valuation evidence through an expert appraiser. The Court finds both experts to be credible with no major discrepancies of significant import in their testimony to tender one more reliable than the other. Both experts were testifying as to the fair market value and were using the same definition provided by the American Institute of Real Estate Appraisers and the Society of Real Estate Appraisers.[3] The only important difference between the testimony of the two appraisers was the value they attributed to the Property. As the Court has no reason to place greater credence on one expert's testimony than the other's, and recognizing that valuation of property is not an exact science, *In re Gustav Schaffer Co.,* 103 F.2d 237 (6th Cir.), *cert. denied sub nom., Wells v. Boyle,* 308 U.S. 579, 60 S.Ct. 96, 84 L.Ed. 485 (1939), the Court finds the difference in the values

---

3. The definition of fair market value, as defined by the American Institute of Real Estate Appraisers and the Society of Real Estate Appraisers is:

"The highest price in terms of money which a property will bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably, and assuming the price is not affected by undue stimulus." Implicit in this definition is the consummation of a sale as of a specified date in the passing of title from seller to buyer under conditions whereby:

1. Buyer and seller are typically motivated.
2. Both parties are well informed, are well advised, and each acting in what he considers his own best interest.
3. A reasonable time is allowed for exposure in the open market.
4. Payment is made in cash or its equivalent.
5. Financing, if any, is on terms generally available in the community at the specified date and typical for the property type in its locale.

is properly attributable to a difference of professional opinion. The Court, therefore, finds the fair market value as somewhere in between the $801,000 value attributed to the Property by the Debtors and the $704,000 value attributed to it by Heritage. The Court further finds valuation of $750,000 for the purposes of this proceeding is reasonable. However, even if the Court were to find that the values of the Property for purposes of this proceeding is as low as $700,000, as counsel for Heritage argues both in his brief and in oral argument, the Court could still conclude that the Debtors have proven that Heritage is adequately protected by the equity cushion that presently exist between the amount of the loan commitment and the value of the Property. According to the Plaintiffs' argument in this matter there will be an equity cushion of approximately $81,326.06 (Heritage's brief p. 14). This figure was arrived at by counsel for the Plaintiffs as follows:

"Starting with the valuation for bankruptcy purposes of approximately $700,000 and subtracting the claim of Heritage Savings and Loan of $548,188.41, the mechanic's liens of $60,301.70, and the tax claims of $10,183.83 leaves $81,326.06. . . . With interest accruing at $174.95 per day and cost of administering a cumbersome bankruptcy proceeding, the slim margin of protection will be exhausted in a very short period of time." (Heritage's brief, p. 14).

Since the Court has concluded that the value for purposes of this proceeding is approximately $750,000 rather than $700,000 as the Plaintiffs have argued, the equity cushion may well be over $130,000. Although the Plaintiffs are correct that interest and other costs are accruing daily, thereby increasing the amount of the encumbrances against the Property, both appraisers testified that the value of the Property would probably increase over time. This increase in value will help maintain the equity cushion that presently exists by, at least, partially offsetting the increasing amount of indebtedness due to interest and cost continuing to accrue. "Of course in some instances where collateral is appreci-

ating, nothing need to be done by the trustee as the mere passage of time constitutes adequate protection." 2 *Collier on Bankruptcy*, 15th ed. § 361.01[1] at 361–6. In this case the Court concludes that although the amount of the equity cushion may decrease daily as a result of the accruing interest and other cost exceeding any enhancement of value in the security, the amount of the cushion is sufficiently large at this time to make a granting of the relief from stay a premature action. Furthermore, the Court notes that the Supreme Court has said that there is no unconstitutional deprivation of property by the erosion of the equity cushion. "Safeguards were provided to protect the rights of secured creditors throughout the proceedings, to the extent of the value of the property . . . There is no constitutional claim of the creditor to more than that." *Wright v. Union Central Life Ins. Co.*, 311 U.S. 273, 278, 61 S.Ct. 196, 199, 85 L.Ed. 184 (1940). Collier expounds on this statement by adding:

"It would appear that in a constitutional sense the right of the secured creditor entitled to protection will be no more than the lesser of the value of the collateral or the amount of the debt. There would be no right to have a 'cushion' maintained on constitutional grounds although for policy reasons it may be appropriate to maintain the margin of security over debt as a means of 'adequate protection'." *Collier on Bankruptcy,* 15th ed. § 362.01 at 362–15.

The Court is of the opinion that it should conclude that the Plaintiffs are currently adequately protected by the equity cushion that presently exists between the amount of the Debtors' obligation to Heritage and the value of the Property.

Plaintiffs argue in the alternative that they should be granted the relief from stay pursuant to subsection (d)(2) of § 362. Section 362(d)(2) is an avenue for relief only from a stay of an action against property and in order for the secured creditor requesting relief to prevail two facts must be proved. First that the Debtor has no equi-

ty in the property and second that the property is not necessary to an effective reorganization. It is clear in this case that the Debtors have no equity in the Property as claims of over a million dollars are outstanding against the Property which has been determined for the purpose of this hearing as having a value of $750,000. The Debtors, however, claim that since the real estate is the only asset and that the intended purpose of their business is the developing and selling of real estate, the Property is necessary to an effective reorganization. The Debtors' present financial condition effectively precludes them from acquiring other real estate. If they are denied the use of the real estate they currently own, it becomes abundantly clear that the Debtors' reorganization potential is extinguished.

The commentator in *Collier on Bankruptcy,* 15th ed. makes the following comments concerning relief pursuant to the requirements of § 362(d)(2):

"This alternative [362(d)(2)] will be of little practical value to creditors in reorganization cases since in most cases the property will be needed for an effective reorganization, although the argument may exist that not every asset will be necessary for an *effective* reorganization. The reference to an 'effective' reorganization should require relief from the stay if there is no reasonable likelihood of reorganization due to creditor dissent or feasibility considerations. The lack of equity test should be most relevant in liquidation cases where rehabilitation is not being sought and where if there is no equity to be realized for junior interest there is no reason to continue the stay." 2 *Collier on Bankruptcy,* 15th ed. § 362.-07[2] at pp. 362–48 (footnotes deleted—emphasis in original)

The Plaintiffs presented no evidence that the Property is not needed for an effective reorganization. The Debtors have shown that without this Property there cannot be a reorganization. The Court cannot determine that there is no reasonable likelihood of reorganization due to creditor dissent. The junior creditors do not dissent in this case. In fact the majority of the creditors' committee oppose the relief from stay being granted and desire that the Debtors be allowed an attempt to reorganize. The Court at this time cannot find that a reorganization is not feasible. It is early in the case. The plan has not been submitted.[4] There is no other evidence before the Court that would allow it to determine that a reorganization is not feasible for the Debtors. Therefore, although the Debtors have no equity in the Property, the Property is necessary for the Debtors to effectively reorganize and a relief from stay pursuant to § 362(d)(2) should not be granted.

Although relief is being denied at this time (and properly so because of a finding of adequate protection to the Plaintiffs and the need of the Property for an effective reorganization), the safeguards of adequate protection to the secured creditor must remain paramount and thus denial in no way

---

**4.** The time in which the Debtors have the exclusive right to file a plan has not yet expired. 11 U.S.C. § 1121(b) (Bankruptcy Reform Act of 1978) states:

"(b) Except as otherwise provided in this section, only the debtor may file a plan until after 120 days after the date of the order for relief under this chapter."

The Debtors will therefore have until on or about March 1, 1980 to file their plan. The legislative history to 11 U.S.C. § 1121 further reveals:

"Subsection (b) gives the debtor the exclusive right to file a plan during the first 120 days of the case. There are exceptions, however, enumerated in subsections (c) and (d). If a trustee has been appointed, if the debtor does not meet the 120-day deadline, or if the debtor does meet that deadline but fails to obtain the required consents within 180 days after the filing of the petition, then any party in interest may propose a plan. This includes the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, and an indenture trustee. The list is not exhaustive. Finally, subsection (d) permits the court, for cause, to increase or reduce the 120 day and 180-day periods specified. Cause might include an unusually large or unusually small case, delay by the debtor, or recalcitrance among creditors." House Report No. 95–595, 95th Cong., 1st Sess. (1977) 406, U.S.Code Cong. & Admin.News 1978, p. 5904.

precludes subsequent similar complaints, nor does it portend a successful reorganization. The Debtors cannot ignore the rights of the Plaintiffs because any disposition of the real estate by the Debtors involves the disturbance of the security interest of the Plaintiffs which of necessity will require compliance with 11 U.S.C. § 363(f). In addition, the ultimate test of an acceptable and confirmable plan must be met. 11 U.S.C. §§ 1126, 1129.

An appropriate order will enter.