In re 5–LEAF CLOVER CORP., J & J Motors, Inc., and W & C Coal Company, Debtors.

INGERSOLL–RAND FINANCIAL CORPORATION, a corporation, Plaintiff,

v.

5–LEAF CLOVER CORP., J & J Motors, Inc., and W & C Coal Company, corporations, Defendants.

Bankruptcy Nos. 80–50053, 80–50054, 80–50052.

A.P. Nos. 80–0103, 80–0104, 80–0102.

United States Bankruptcy Court, S. D. West Virginia.

Sept. 3, 1980.

James K. Sheatsley, Higgins & Gorman, Beckley, W. Va., for the defendants, 5–Leaf Clover Corp., J & J Motors, Inc., and W & C Coal Company.

P. Michael Pleska, Bowles, McDavid, Graff & Love, Charleston, W. Va., and Robert Rosenberg, Ingersoll–Rand Financial Corporation, Paramus, N. J., for the plaintiff, Ingersoll–Rand Financial Corporation.

## MEMORANDUM OF OPINION

EDWIN F. FLOWERS, Bankruptcy Judge.

Ingersoll–Rand Financial Corporation asks that the automatic stay imposed by 11 U.S.C. § 362 be lifted to enable it to repossess certain mining equipment owned by the Debtors in which Ingersoll–Rand claims a security interest.

A preliminary hearing on the matter was held on July 9, 1980. At that time, the Court approved a motion to consolidate the three cases for hearing since the evidence was essentially identical in each case and no objection to the motion was received.* Conflicting evidence was offered as to the value of the equipment and the balance of the debt owed to Ingersoll–Rand. Nonetheless, the evidence established that the Debtors did have some equity in the equipment. The Court concluded that the equity afforded Ingersoll–Rand adequate protec-

tion pending the final hearing and ordered the automatic stay to continue in the interim. Having also heard testimony in behalf of Ingersoll–Rand that the Debtors were delinquent on two installments, the Court cautioned the Debtors that they could not expect secured creditors to finance their reorganization. The Court further suggested that an appraisal of the equipment would be helpful in establishing its fair market value.

The final hearing was held on August 5, 1980, at which time the parties presented additional evidence to the Court and argued the law to be applied to that evidence.

The evidence establishes that, at some time after the incorporation of the Debtors, a considerable amount of mining machinery was purchased by them from the assignors of Ingersoll–Rand. On January 25, 1980, Ingersoll–Rand refinanced the various debts of the three Debtors. New security agreements were executed and the proper U.C.C. filings were made to perfect the security interests. This refinancing resulted in eight separate accounts with Ingersoll–Rand—four owed by 5–Leaf Clover, three by J & J Motors, and one owed by W & C Coal—representing thirty–seven different pieces of equipment. The secured status of Ingersoll–Rand is not disputed. The parties stipulated at the preliminary hearing that Ingersoll–Rand had validly perfected its liens well before the Chapter 11 petitions were filed by the Debtors.

The evidence offered by Ingersoll–Rand and the Debtors varies as to the balance due on the eight accounts. Counsel for Ingersoll–Rand proffered a schedule of accounts which reflects a total close–out balance due, using the interest rebate Rule of 78s, of $701,074.30 on August 5, 1980, the date of the final hearing. The Debtors' accountant testified that the close–out balance on May 15, 1980, again using the Rule

---

* The three debtor companies are related by virtue of identical, or nearly identical, ownership. The complaints filed refer to eight different accounts, representing thirty–seven pieces of equipment, between Ingersoll–Rand and the Debtors. Much of the evidence presented was cumulative in nature and the relief requested was couched in similar terms. The Court recognizes that had it considered each item of equipment separately, the outcome as to a particular item might have differed from the final result achieved.

of 78s, was $654,300.55. To aid in comparison of the two amounts, the Court must adjust the Debtors' May 15 figure, adding the interest accrued daily from May 15 to August 5, or $322.27 per day for 82 days. This produces an August 5 close–out balance of $680,726.69. Thus, there is a slight disparity of some $20,000 between the Debtors' figures and those of Ingersoll–Rand. No evidence was offered to otherwise reconcile the two amounts.

On the other hand, the evidence as to the value of the equipment varies greatly between the parties. The equipment was appraised at the request of Ingersoll–Rand on July 31 and August 1, 1980, by a representative of Phillips Machine Service in Beckley, West Virginia. The total fair market value of all of the equipment was estimated at $762,400. The Debtors' accountant testified that the book value of the equipment on the Debtors' account was approximately $982,332 on May 15, 1980. Although an appraisal was made on behalf of the Debtors, the Court did not receive competent evidence of that appraisal. Counsel for the Debtors attempted to introduce the appraisal, not by testimony of the appraiser, but through the hearsay testimony of a witness who was not qualified as an expert on the fair market value of the equipment. That testimony must therefore be excluded. Moreover, the Court gives greater weight to the presumably independent appraisal submitted by Ingersoll–Rand than to the testimony of the Debtors' accountant of the book value. Thus, the Court accepts the figure of $762,400 as the one more likely to reflect the fair market value.

The amount of equity accumulated by the Debtors ranges from approximately $61,326 to $81,674, depending upon whether the Court uses the balance due reported by the Debtors or that proffered by Ingersoll–Rand. In either case, the equity provides a small cushion of protection to the Creditor.

The Debtors contend that the equity cushion, regardless of its size, provides adequate protection to Ingersoll–Rand pending confirmation of the Debtors' plans, which will include payments to Ingersoll–Rand as a secured creditor. On the other hand, Ingersoll–Rand argues that although the equity may provide a "cushion," a creditor's interests are not adequately protected by a cushion of equity which is rapidly decreasing in amount. It contends that it is entitled to the maintenance of the cushion at a constant level, which can be achieved only by regular payments to it by the Debtors.

■ "Adequate protection" is not defined in 11 U.S.C. § 362, nor is it defined in section 361 of the Bankruptcy Code, which merely offers methods of providing adequate protection. See 11 U.S.C. § 361(2)–(3). The legislative history of section 361 clearly reflects the intent of Congress to give the courts the flexibility to fashion the relief in light of the facts of each case and general equitable principles. H.R.Rep.No. 95–595, 95th Cong., 1st Sess. 339 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787.

■ Case law under the Bankruptcy Code has held that adequate protection under section 361 can be provided by an equity cushion. See In re Rogers Development Corp., 5 B.C.D. 1392, 2 B.R. 679 (Bkrtcy.E.D.Va.1980); In re Pitts, 2 B.R. 476 (Bkrtcy.C.D.Cal.1979). See also In re Blazon Flexible Flyer, Inc., 407 F.Supp. 861 (N.D.Ohio 1976). However, at least one court has recognized that the equity cushion can be dissipated:

Adequate protection . . . requires, at a minimum, a periodic and careful surveillance of the facts and circumstances calculated to avoid dissipation of whatever protection the cushion affords. [In re Pitts, supra, at 478–79].

Thus, at some point, the diminishing cushion will no longer provide adequate protection for the secured creditor.

■ The Court is in agreement that the equity cushion adequately protects creditors' interests—up to a point. Equity provides adequate protection so long as the creditor may foreclose upon the collateral and realize an amount sufficient to fully cover the balance due on the debt. This does not mean, however, that the creditor

must wait until there is no equity before it is entitled to a lifting of the stay to foreclose on the property. Although a debtor may have equity in the collateral, where regular payments are not being made that equity decreases over a period of time as the accrued interest increases the balance due on the debt and accumulating depreciation decreases the value of the property. In this circumstance, the equity decreases at a rate determined by combining the interest and depreciation rates. Thus, the equity reaches zero at the point in time at which the debt balance and the market value converge, or are equal. Conversely, the equity ratio can be kept constant by payment of both the interest and depreciation to the creditor.

■ The U.C.C. dictates a rule of commercial reasonableness in disposition of collateral to satisfy a debt. W.Va.Code § 46–9–504(3) (Cum.Supp.1980). The time required to make a commercially reasonable disposition of the collateral will vary according to the nature of the collateral and the condition of the market in which it will be sold. The secured creditor should be permitted to proceed against the collateral when full recovery becomes impaired—the time at which the process of collateral disposition should commence to enable the creditor to realize an adequate amount from the secured property to satisfy the debt. The creditor is minimally entitled to assure its own protection by having a reasonable period of time in which to sell the collateral at the highest price attainable. The value of the collateral is further decreasing even while the creditor is attempting to sell it. To require the creditor to wait until the collateral's value equals the lien attaching to it before foreclosure and sale is permitted does not adequately assure the creditor that the debt can be fully covered. At that point, the creditor is reduced to "quick sale" tactics, attempting to sell as soon as possible to offset the decline in the collateral's value. Thirty to sixty days would be necessary to assure disposition in a commercially reasonable fashion of the kind of equipment serving as security for the debt to Ingersoll–Rand. In this instance, Ingersoll–Rand is entitled to a sixty–day period of time to accomplish its statutory responsibilities without further impairment of its opportunity for a full recovery.

■ At the same time, in permitting the continuation of the stay until the impairment date is reached, the debtor is afforded some time to accumulate cash from its operations. During this time the debtor typically is making no payments to the creditor on the secured debt—were it otherwise, the creditor likely would not be before this Court seeking relief from the automatic stay. In the instant case, the Debtors failed to pay installments due in May, June and July. The debtor may postpone and continuously advance the impairment date by regular payments which at least equal the combined depreciation and interest on the debt. In this manner the equity ratio will be maintained at the appropriate level. If the debtor is unable to do so, the automatic stay will be lifted to permit the creditor to repossess the collateral and dispose of it in satisfaction of the debt. The Court believes this to be a fair and balanced result which satisfies the intent of Congress evidenced in sections 361 and 362 of the Bankruptcy Code. H.R.Rep.No.95–595, 95th Cong., 1st Sess. 339 (1977); S.Rep.No.95–989, 95th Cong., 2d Sess. 52–54 (1978), U.S. Code Cong. & Admin.News 1978, p. 5787.

■ While the Debtors have offered no direct evidence of the necessity of the equipment for reorganization, circumstantial evidence permits the Court to conclude that without the collateral an effective reorganization of the Debtor is not likely. That conclusion is not dispositive of the issues raised in this proceeding. However necessary such property is to their reorganization, the Debtors are not entitled to the use of the equipment absent adequate protection to Ingersoll–Rand. While the Bankruptcy Code contemplates the continued use and possession of property during the bankruptcy proceedings, it does not require secured creditors to finance the reorganization. The impairment rule helps implement this principle.

The application of the impairment rule to the instant case dictates that the Debtors commence payment to Ingersoll–Rand. The equity of the Debtors ranges from approximately $61,326 to $81,674. Ingersoll–Rand offered testimony to establish a depreciation rate of 2.2%, or approximately $25,000 per month. The Debtors presented evidence of a different amount of depreciation taken by them, based upon the varying depreciable lives of the equipment. It is impossible for the Court to otherwise compute the Debtors' depreciation rate from the evidence proffered. Thus, the only competent evidence on the matter is the unrefuted depreciation rate offered by Ingersoll–Rand. This is accepted by the Court as reasonable.

The contract interest rate of $322.27 per day on the unpaid balance totals approximately $10,000 per month. Again, this evidence was introduced by Ingersoll–Rand and was not contradicted by the Debtors. Combining the depreciation and interest rates, the Debtors' equity is deteriorating at a rate of $35,000 per month. Thus, their equity will reach the zero point in somewhat less than sixty days, the figures used having been established as of August 5, 1980, or one month ago.

Accordingly, the principle here adopted by the Court requires that the Debtors must make payment in the amount of $35,-000 to Ingersoll–Rand to provide adequate protection to this secured creditor and to not impair the likelihood of full recovery on its debt. The Debtors will be permitted fifteen days from the entry of the order accompanying this Memorandum to make such payment to Ingersoll–Rand. The payments will thereafter continue on a monthly basis until confirmation of the Debtors' plans which may make other provisions to satisfy appropriate portions of the Code. *E. g.*, 11 U.S.C. § 1124. If the Debtors are unable to make the payment within fifteen days, the stay will be lifted and the mining equipment must be relinquished to Ingersoll–Rand for disposition in some fashion in satisfaction of the debts owed it by the Debtors.

An order will be entered pursuant to the foregoing disposition of this proceeding.