In re MR. D REALTY COMPANY, Debtor.

The CENTRAL TRUST COMPANY N.A., Plaintiff,

v.

MR. D. REALTY COMPANY, Defendant.

In re S & M ASSOCIATES, Debtor.

The CENTRAL TRUST COMPANY N.A., Plaintiff,

v.

S & M ASSOCIATES, Defendant.

Bankruptcy Nos. 1–82–0452, 1–82–0451. Related Case Nos. 1–82–02817, 1–82–02816.

United States Bankruptcy Court, S.D. Ohio, W.D.

Feb. 2, 1983.

Arthur J. Schuh, Cincinnati, Ohio, for defendant.

Gerald L. Baldwin, Cincinnati, Ohio, for plaintiff.

## DECISION AND ORDER RE STAY

BURTON PERLMAN, Bankruptcy Judge.

Plaintiff is a mortgage lender to the two defendants, each of which is a debtor in a Chapter 11 case pending in this Court. We write a single decision in the two captioned cases because the relief sought in the respective complaints is identical. Because defendants have defaulted in their payment obligations under their mortgage note to plaintiff, plaintiff wishes to foreclose upon its collateral. To implement that purpose plaintiff has brought the above captioned adversary proceedings which seek to have the automatic stay of 11 U.S.C. § 362 lifted so that it can proceed with foreclosure. Plaintiff and defendants had a separate agreement providing for assignment of rents in the event of default by defendants. Plaintiff brought on a motion for preliminary injunction in order to compel compliance with this agreement. After a hearing, we denied that motion. Upon the denial by defendants in their answers that grounds for lifting of the stay existed, these cases came on for a bench trial, at the conclusion of which we reserved decision.

Preliminarily we deal with a question as to admissibility which arose during the trial. Defendant utilized and offered in evidence DX 15, a spread sheet prepared for defendants showing a recap of rental income. Plaintiff objected to the exhibit on grounds that it had asked for this information prior to trial but not received it. We then reserved decision, but now overrule the objection, finding that plaintiff is not prejudiced by the admission.

The parties were in agreement that the question for decision arises under 11 U.S.C. § 362(d)(1). That is, we must decide whether plaintiff suffers a lack of adequate protection of its interest in the real estate of defendants. Under § 362(g) defendant has the burden of proof as to adequate protection. Defendants' position appears to be that the valuation of the property is higher than asserted by plaintiff, and the indebtedness to plaintiff is lower than asserted by plaintiff, so that plaintiff without more is adequately protected. This appears to be an equity cushion argument, yet defendants argue that adequate protection does not depend upon an equity cushion, which, of course, makes for a certain amount of confusion.

The major instruments here involved are a mortgage note dated August 2, 1977 stating a maturity date of August 5, 1982 (as modified by JX–B to alter the maturity date to August 5, 1980), and an "Open End Real Property Mortgage (Wraparound)" also dated August 2, 1977. The parties to these documents are the lender, plaintiff herein, and the debtors, defendants herein. Marvin R. Guttman signed as president of Mr. D Realty Company (an Ohio corporation), and also on behalf of S & M Associates (an Ohio limited partnership), Guttman being identified as the sole general partner of the latter. Guttman also signed the note individually as a guarantor. He is not personally a debtor in this court.

Three real estate locations comprise the collateral securing the note and mortgage. One is known as Paddock Center which contains warehouse and office space. Title to that property is in the name of defendant S & M Associates. The other locations are known as Chestnut Hill Square Apartments and Victory Arms Apartments, both of which are owned by Mr. D Realty Company of which Guttman is the president and sole stockholder. Plaintiff at the time of the above noted transaction took a position subordinated to senior mortgagees on all

three locations. Evidently, Guttman had had a long standing relationship with the plaintiff prior to the time of the instant transaction, but this record leaves us not fully informed as to the specifics of that prior relationship.

In any event, the mortgage, JX–C dated August 2, 1977 was designated "wraparound". The parties are in sharp disagreement as to the definition of that term. Evidently there is no dispute that it is a loan transaction entered into between a lender and borrower where there is already a senior encumbrance on the property. It is not, however, simply a second mortgage. The position of defendants is that the term "wraparound" is a generic term relating to a number of expedients which may be employed in such a circumstance. Plaintiff, to the contrary, presented testimony that certainly with respect to the present transaction the term had a very specific meaning, and for present purposes, the most outstanding aspect of that meaning is that the loan was non-amortizing. The transaction involved the making of all required payments to senior mortgagees by plaintiff on behalf of the defendants, but to the extent that such payments were on account of principal, the principal obligation to plaintiff of defendants increased dollar for dollar. The balance of payments received by plaintiff from defendants borrowers was applied entirely to interest. The attraction of the wraparound device to defendants was that it minimized the monthly payments which they had to make. In this respect, the arrangement was much more satisfactory to defendants than a second mortgage would be.

■ After carefully reviewing the evidence, we have come to the conclusion that plaintiff's contention is correct that the transaction embodied in the mortgage note of August 2, 1977 was non-amortizing.

Some indication of the intention of the parties as to the nature of the wraparound transaction is paras. 26–29 of the mortgage (JX–C) which are attached hereto as Appendix A. From those provisions it is clear that plaintiff assumed the obligation, so long as defendants were not in default on their obligations under the mortgage note, to make current payments of principal and interest on any senior mortgage on the property comprising the collateral. In the event of default by defendants, plaintiff had the right at its option to continue making payments on the first mortgage. Especially important is para. 29 in which the parties agree that plaintiff here in the event that it makes payments on the first mortgage becomes entitled to a lien on the premises equal to that of the first mortgagee and moreover becomes subrogated to the rights of the first mortgagee.

Furthermore, an examination of the mortgage note of August 2, 1977 discloses that its principal amount is $4,241,990.96. It also discloses an interest rate of 8½%. The simple computation of the principal amount at 8½% yields an annual payment of $365,569.22. The mortgage note also expressly provides for payments of $7,476.15 four times each month. When this is annualized, it does not quite equal the amount derived upon our computation above. It is some $2,000.00 off. For practical purposes we are satisfied that it is fair to say that this mortgage note obligated the borrowers to make periodic payments in such an amount as would yield the lender 8½% on the principal amount. In view of all of the foregoing, we will not allow defendants to deny that the loan was non-amortizing. Finally, defendants knew or should have known that the advantageous cash flow aspect of the transaction with plaintiff, was the result of a non-amortizing arrangement.

■ Defendants were in default under the terms of the mortgage note prior to its maturity date. The evidence discloses that thereafter plaintiff decided that it would charge defendants a fluctuating interest rate keyed to the prime rate. Debtors were informed of this action, did not object to it, and indeed made payments in conformity with such rate as was thereafter currently charged. Plaintiff contends that there was consideration for this conduct when it refrained from foreclosing on its collateral as it had a right to do after the mortgage

went into default. We agree with this contention of plaintiff. Defendants are bound by the interest rates from time to time fixed by plaintiff.

The two issues disposed of above, the nature of the wraparound mortgage and the entitlement of plaintiff to an interest rate higher than that stated in the mortgage note after the maturity date of the latter, caused the parties to have radically different views of the amount of the indebtedness owed by defendants to plaintiff. Our resolution of these issues positions us to proceed now to the question of adequate protection. A preliminary statement must first be made. On the record before us we cannot conclude that the amount stated by plaintiff to be due it is exactly correct. We do believe the magnitude to be correct. That is all that is necessary for present purposes, for our present consideration will not result in a money judgment. It will result only in a determination of whether the stay should be lifted. With this caveat, we move toward determination of adequate protection. The first step is for us to derive a figure for indebtedness of defendants to plaintiff.

The starting obligation of defendants on August 2, 1977 to plaintiff was $4,241,-990.96. (We feel some uncertainty about this because the note, JX–A, also uses the figure $4,156,140.56 for some unexplained reason.) We have concluded that the periodic payments made by defendants as provided in the mortgage note were properly applied only to interest, so that the principal amount was undiminished by reason of such payments. The evidence then showed that on October 24, 1980 the sum of $833,-369.82 was applied to principal. The source of this amount was a sale to Cincinnati Metropolitan Housing Authority of a portion of the holding known as Victory Arms Apartments. Based upon the foregoing we accept the position of plaintiff that the principal balance owed by defendants on the subject property (the principal balance being distributed between senior mortgagees and plaintiff) is approximately 3.3 million dollars.

As stated above, we have concluded that plaintiff was entitled to the interest which it charged at the rate during the term of the mortgage note of 8½% and thereafter fluctuating in relation to the prime rate. This means that we reject what appears to be the position of defendants that plaintiff was bound by the interest rate set in the mortgage note from the date of the note and continuously to the present. We accept the figure for total interest due of 0.87 million dollars. This makes for a combined total owing by defendants for principal and interest of all the mortgage interest indebtedness on the subject property of approximately 4.2 million dollars.

We turn next to the question of the value of collateral. Plaintiff offered the testimony of an expert witness Raymond Jackson, to establish fair market value of the collateral. Jackson fixed fair market value for each of the locations. He defined market value as:

> The highest price estimated in terms of money which a property will bring if offered for sale in the open market by one who desires, but is not required to sell, allowing a reasonable period of time in which to find a purchaser, not required to buy, who buys with knowledge of all the uses to which the property is capable of being used and all the elements reasonably affecting value.

His opinion was that the fair market value of Chestnut Hill was 4.7 million dollars; for Victory Arms Apartments, $165,000.00; and for Paddock Center, $475,000.00. This makes for a total value of 5.34 million dollars. He testified further that a "reasonable period for sale" as that phrase is used in his definition of fair market value was, for Chestnut Hill, a period of four to six months; for Victory Arms, six to twelve months; and for Paddock Center, nine to twelve months. Jackson testified that a reduction in valuation would be called for in the event that a shorter period of time were allowed in which to accomplish the sale.

Defendants offered expert testimony on valuation by Guttman. He did not particularly take issue with the valuations set by

Jackson on Victory Arms and Paddock Center, but he did testify that in his opinion Jackson's value of Chestnut Hill was low by some 2 million dollars. He based this upon a program of condominiumization which he said is taking place at Chestnut Hill. It became clear on cross-examination, however, that this figure was in his mind prospective, and tied to the progress of the condominiumization process, for he said that today the property was worth figures quite comparable to those testified to by Jackson.

There is thus an equity cushion of some 1.1 million dollars in the collateral. Plaintiff takes the position that this is not sufficient to offer it adequate protection within the requirements of the law.

Because plaintiff's own evidence discloses that defendants do have an equity in their property comprising the collateral in issue, the question of whether the Court should order that the stay be lifted, arises under 11 U.S.C. § 362(d)(1), and not under § 362(d)(2). That is, in order for us to grant plaintiff the relief which it seeks, § 362(d)(1) requires that we find that there exists a lack of adequate protection for plaintiff. While we conclude that such lack does not exist at the present time, we conditionally deny plaintiff the relief which it seeks.

In a Chapter 11 context, the purpose of the automatic stay provided by § 362 of the Bankruptcy Code, is not as an end in itself, but rather to facilitate reorganization. *In Re Antilles Yachting, Inc.* 4 B.R. 470 (Bkrtcy.D. Virgin Islands, 1980). Its function so far as secured creditors are concerned, is to preserve their position, within equitable limits, during the period between the filing of the case and the confirmation of a plan of reorganization. The following analysis from *In Re Pine Lake Village Apartment Co.* 19 B.R. 819, 824 (Bkrtcy.S.D.N.Y., 1982) is very much in point:

Section 362(d)(1) of the Bankruptcy Code prescribes a remedy for a creditor who seeks relief from the automatic stay imposed by § 362(a). After notice and a hearing, the court may terminate the stay "for cause, including the lack of adequate protection of an interest in property . . ." [§ 362(d)(1) ]. Neither the legislative history nor the Code indicate that Congress intended the concept of adequate protection to go beyond the scope of protecting the secured claim holder from a diminution in the value of the collateral securing the debt. This conclusion is supported by the following statement contained in the Senate Report accompanying the 1978 Bankruptcy Reform Act:

"Adequate protection in the form of either cash payments or a replacement lien must be provided the creditor *whose collateral is decreasing in value or is being consumed during the stay.* S.Rep. No. 95–989, 95th Cong. 2nd Sess. p. 4, U.S.Code Cong. & Admin.News 1978, pp. 5787, 5790. [Emphasis added]

In addition, the following from *In Re Curtis* 9 B.R. 110, 112 (Bkrtcy.E.D.Pa., 1981) provides a good general and relevant statement:

Although the existence of an equity cushion as a method of adequate protection is not specifically delineated in § 361, it is the classic form of protection for a secured debt justifying the restraint of lien enforcement by a bankruptcy court. *See In re San Clemente Estates,* 5 B.R. 605, 6 B.C.C. 838 (Bkrtcy.S.D.Calif. 1980) citing to *In re Blazon Flexible Flyer, Inc.* 407 F.Supp. 861 (N.D.Ohio 1976). The conclusion that an equity cushion created by the excess of security over debt can itself constitute adequate protection with nothing more has been widely accepted. *In re San Clemente Estates, supra: In re Tucker,* 5 B.R. 180, 6 B.C.D. 699 (Bkrtcy.S.D.N.Y.1980); *In re Rogers Development Corp.* 2 B.R. 679, 5 B.C.D. 1392 (Bkrtcy.E.D.Va.1980); *In re Sulzer* 2 B.R. 680 [630], 5 B.C.D. 1314 (S.D.N.Y.1980); *In re Pitts,* 2 B.R. 476, 5 B.C.D. 1129 (Bkrtcy, C.D.Calif.1979); 2 *Collier on Bankruptcy,* § 361.01[3]; § 362.01[1] 15th

Furthermore, the legislative history of § 361 reflects that Congress intended that

the Courts have flexibility in dealing with questions of adequate protection. *In re 5–Leaf Clover Corp.* 6 B.R. 463 (Bkrtcy.S.D.W. Va.1980). For the reason that flexibility in administration is appropriate in these cases, we reject the suggestion of plaintiff that land should be valued at most at 50% of fair market value for adequate protection purposes, for which it cites *Matter of Lake Tahoe Land Co., Inc.* 5 B.R. 34 (Bkrtcy.D. Nev.1980). (In that case, in fact, there was no equity cushion shown to exist, and the rule extracted by plaintiff here from that case is at best dictum. Plaintiff also cites *In re San Clemente* 5 B.R. 605 (Bkrtcy.S.D. Cal.1980) as support for its proposal for a requirement of a high equity cushion, but that court made no such requirement. Indeed, the court was critical of the *Lake Tahoe* case saying that it was "inconsistent with the Congressional intent that each case is to be judged on its own facts.")

With the foregoing guiding principles before us, we turn to the facts at hand. The current rate of interest on its loan to which plaintiff is entitled is two points over prime, or presently thirteen percent. Since the principal owing is 3.3 million dollars, this means that interest is accruing at the rate of $429,000.00 a year, or $35,750.00 per month. It is only this charge which is causing the decrease in value contemplated in *Pine Lake Village* and as to which adequate protection requires that plaintiff be protected.

In evaluating that position, we must reduce the amount we have stated above as the existing equity cushion established by the evidence by an amount representing the interest which would accrue during the period which must be allowed, in accordance with the testimony of Jackson, for a sale to occur which would yield the fair market value. In the case of the largest portion of the real estate, the Chestnut Hill location, we will average the four to six months which Jackson said would be required. For five months, then, that amount would be $178,750.00 (5 × $35,750.00). We will round that figure off to $200,000.00 on account of the other two real estate locations which are of much smaller value,

though the time to consummate a sale for fair market value purposes is longer. A further deduction from the margin of equity cushion is the real estate commission which would be involved in a sale. While in transactions of this magnitude commissions are subject to negotiation, plaintiff's expert testified that a reasonable commission would be in the vicinity of 5%. For the three parcels we have concluded that $270,000.00 would be a fair estimate to be allowed for commission.

A factor which must be taken into consideration in determining the adequacy of an equity cushion is whether the value of the collateral is decreasing with time. To the contrary, plaintiff's expert testified that the largest holding here involved, Chestnut Hill, was appreciating at the rate of approximately 5% per year. At his valuation, this is an annual rate of appreciation of $235,000.00, or $19,583.00 per month. He testified that the other properties were essentially stable.

We have then the equity cushion of 1.1 million dollars which we earlier derived. This must be reduced by $200,000.00 on account of interest which will accrue during the period it will take to accomplish a sale within the definition of fair market value, and also by $270,000.00 on account of real estate commissions in accomplishing a sale. This leaves a present net equity cushion of some $630,000.00. We hold that this is a reasonable equity cushion to give plaintiff adequate protection at the present time. In this respect, we observe that while plaintiff contends that it is entitled to the benefit of its bargain, this record is silent as to the equity cushion at the outset of the transactions here involved.

This cushion, however, is being eroded at the rate of some $16,167.00 per month, the difference between the monthly interest charge and the monthly appreciation and debtor must provide a mechanism to protect plaintiff against this erosion. It is for debtor to suggest an appropriate means for securing such adequate protection to plaintiff. *In re San Clemente Estates,* 5 B.R.

605 (Bkrtcy.S.D.Cal.1980). Nevertheless, because debtors at the conclusion of the hearing requested that the court suggest what would be appropriate by way of adequate protection, we will mention one means, consistent with § 361(1), by which defendants could fulfill this obligation. We have concluded that a payment of $20,-000.00 per month would afford adequate protection to plaintiff during the period until the confirmation hearing on a plan. We derive this figure by upwardly adjusting the erosion rate, $16,167.00 per month. An upward adjustment is warranted, first, because the erosion rate figure is only an approximation. Secondly, we couple with this the testimony at the trial, which is reinforced by our experience, that real estate appraisals are subject to a significant margin of error. In addition, debtors must provide adequate assurance that property taxes, insurance and maintenance of the property is kept current. *See In re El Patio Ltd.* 6 B.R. 518 (Bkrtcy.C.D.Cal.1980).

█ The foregoing serves to dispose of the First Claims set out in the respective complaints, those claims seeking relief from the automatic stay of 11 U.S.C. § 362 so that plaintiff can proceed with foreclosure in the state courts. It also disposes of the Second Claims, which seek relief from the automatic stay with regard to the assignment of rents. We note incidentally that not only is there an assignment of rents in a separate document JX–D, but there is also one in the mortgage, JX–C. Our conclusion that plaintiff is adequately protected by an equity cushion precludes relief on such Second Claims. A rent assignment is simply additional security for a creditor, and the existence of an adequate equity cushion is a determination that such additional security is not necessary to the preservation of a creditor's position during the interim period between filing a Chapter 11 case and a hearing on confirmation of a plan. *See In re Oak Glen R-Vee,* 8 B.R. 213 (Bkrtcy.C.D. Cal.1981).

Defendants will have ten days from the date of this Order to submit to the Court, on notice to plaintiff, their proposal for adequate protection in light of our foregoing decision.

Judgment will not be entered in this adversary proceeding until we rule on such further submission.

SO ORDERED.

## APPENDIX A

26. Mortgagor covenants and agrees to comply with all of the terms and provisions of said senior mortgages and senior encumbrances (except the requirement to make the payments of principal and interest thereon), and upon compliance by Mortgagor with the terms and provisions contained in said senior mortgages and encumbrances and contained herein, Mortgagee will pay the installments of principal and interest from time to time due under said senior mortgages and encumbrances in accordance with their terms. Nothing contained herein shall require the holder of the note secured hereby to perform the terms or provisions contained in said senior mortgages or encumbrances required to be performed by Mortgagor, its successors and assigns, except the payment of installments of principal and interest, but only in accordance with the terms and provisions hereof. If Mortgagor shall default in the performance of any term or provision contained in this mortgage, Mortgagee shall not be obligated to pay any principal or interest under the senior mortgages or encumbrances. In addition to any other rights granted to Mortgagee herein, Mortgagee shall have the specific rights to make or not make those payments called for by the senior mortgages and encumbrances as is more fully set forth in paragraph 27 of this mortgage.

27. In case of default hereunder, in addition to any other rights and remedies available to Mortgagee, Mortgagee may, but need not, make any payment or perform any act herein required by Mortgagor in any form and manner deemed expedient, and may, but need not, make full or partial payments of principal or interest on any of the senior mortgages or other prior encumbrances, if any, and purchase, discharge, compromise or settle any senior mortgages

or other prior encumbrances, any tax lien or other lien or title or claim thereof, or redeem from any tax sale or forfeiture affecting said premises or contest any tax or assessment.

The provisions of this paragraph 27 shall specifically include the right to make full or partial payments on some senior mortgages and encumbrances and not on others. The rights of Mortgagee as set out above in this paragraph 27 shall be exercised in such a manner as Mortgagee deems to be in its best interests and which it deems shall best protect its interests even if such action is not in the best interests of Mortgagor.

28. Should Mortgagor fail to do or perform any or all of the things to be done or performed by it by reasons hereof or as is required by the senior mortgage, then in addition to any other rights or remedies of Mortgagee, Mortgagee at its option may do or perform the same, and all expenses thus incurred and money thus advanced thereupon shall be charged against Mortgagor. Should any monthly payment or deposit not be paid when due, then from the due date thereof, and from the date any charge is made or expense incurred provided for in this mortgage, the same shall bear interest at the rate of interest contained in the Mortgage Note. If Mortgagor assigns, sells or transfers said premises or any part thereof or any interest therein, whether legal or equitable, without the prior written consent of Mortgagee, at the option of Mortgagee at any time after it receives actual notice thereof, the entire unpaid balance of the loan indebtedness, and all other charges provided for herein, shall thereupon immediately become due and payable. The provisions of the previous sentence shall not be applicable to land contract sales which shall be permitted provided that the unpaid land contract balance shall not be less than the release price set out in a loan agreement of even date.

In the event of any default, other than a failure to make the payments required by this Mortgage or the Mortgage Note which it secures, Mortgagee shall give Mortgagor written notice, by certified mail directed to

Marvin Guttman, 1977 Section Road, Cincinnati, Ohio. Mortgagee shall have ten (10) days after the mailing of the default notice to cure the default specified in the notice.

29. Mortgagor covenants and agrees that, to the extent Mortgagee pays any installment of principal or interest or any other sums due under a senior mortgage or encumbrance, Mortgagee shall become entitled to a lien on the said premises hereunder but equal in rank and priority to the senior mortgage or encumbrance and, in addition, to the extent necessary to make effective such rank and priority: (i) Mortgagee shall become subrogated to, receive and enjoy all of the rights, liens, powers and privileges granted to the senior mortgagee or encumbrance under the senior mortgage or encumbrance, and (ii) the senior mortgage or encumbrance shall remain in existence for the benefit of and to further secure the debt and other sums secured, or that hereafter become secured hereunder.