**In re DIXIE–SHAMROCK OIL & GAS, INC., Debtor.**

**Bankruptcy No. 383–03216.**

United States Bankruptcy Court, M.D. Tennessee.

Feb. 9, 1984.

Karin Dale Coble, Nashville, Tenn., for debtor.

David B. Anderson, Birmingham, Ala., Kenneth R. Jones, Jr., and William L. Harbison, Nashville, Tenn., for AmSouth Bank N.A.

## MEMORANDUM

GEORGE C. PAINE, II, Bankruptcy Judge.

This motion for relief from the stay pursuant to 11 U.S.C.A. § 362(d)(1) (West 1979) was initiated against the debtor, Dixie-Shamrock Oil & Gas, Inc. (hereinafter

Dixie-Shamrock), by a creditor, AmSouth Bank N.A. (hereinafter AmSouth), and at the final hearing was consolidated with Dixie-Shamrock's request to use Am-South's cash collateral. Upon consideration of the evidence presented at the hearing, stipulations, exhibits and the entire record, this court concludes that Am-South's request for relief from the stay should be denied and Dixie-Shamrock's request to use cash collateral should be granted with the following limitations. Dixie-Shamrock shall be entitled to use cash collateral (i) to maintain, protect and enhance the collateral of AmSouth and (ii) to purchase, lease and/or use in any way additional property as long as AmSouth is given a first priority lien in the additional property equal to the amount of its collateral used in connection with said property.

The following shall constitute findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

On April 23, 1982, AmSouth loaned Dixie-Shamrock the principal amount of $7,100,-000.00 pursuant to a secured loan agreement and installment promissory note, both of that same date.

The installment note is secured by deeds of trust which grant AmSouth: a first lien on oil and gas properties located in Fentress, Morgan and Scott Counties, Tennessee; a first priority assignment of all of the production of oil and gas from these properties; and, a first security interest in the equipment, general intangibles, accounts, contract rights, inventory, fixtures, goods to become fixtures and other personal property and proceeds and products thereof as described in the deeds of trust. Dixie-Shamrock concedes that AmSouth properly perfected its liens on the real property, the assignments and the fixtures; thus, there is no issue as to their validity.

Dixie-Shamrock has under lease approximately 220,000 acres of real property in Morgan, Fentress and Scott Counties, Tennessee. Much of this property is subject to a partnership agreement with Blue Ridge Hydrocarbons and is not at issue in this litigation.[1] The remainder of the property consists solely of AmSouth's collateral.

AmSouth's collateral includes various working and overriding royalty interests in 333 oil and gas wells, a majority of which are shut-in wells and not attached to any pipeline. AmSouth has a first mortgage on all of Dixie-Shamrock's producing properties which account for approximately 70% of its income. These properties on an acreage basis constitute approximately 5% of the total properties under lease to Dixie.

The gas from the producing wells is being sold to Tenneco through intermediate pipelines and the oil is being trucked by South Kentucky Purchasing Company to its refinery in Somerset, Kentucky.

The leases on which there is currently no oil or gas production require the payment of delay rentals in absence of production royalties. These leases will be lost by Dixie-Shamrock unless the wells are producing or delay rentals are paid through the primary term of each lease. These delay rentals require Dixie-Shamrock to pay approximately $389,000.00 per year.

Dixie-Shamrock has pipelines into the Burrville and Hurricane Ridge areas. However, in order for Dixie-Shamrock to market its gasoline, a major pipeline must be constructed into the Brimstone area where a majority of its leases are located. This pipeline will cost approximately $500,-000.00 to construct and Dixie-Shamrock has reached an agreement with The Brimstone Company for the building of that pipeline. It is anticipated that this pipeline should be completed by July of 1984 and that Dixie-Shamrock should be receiving revenues from gas sold through the pipeline by October of 1984.

Dixie-Shamrock defaulted under the terms of its loan agreement with AmSouth last spring. On or about October 27, 1983, AmSouth accelerated the total balance due under the installment note and demanded

---

1. The extent to which Dixie-Shamrock's rights to this property are encumbered by the partnership agreement with Blue Ridge Hydrocarbons is unclear.

immediate payment in full of all principal and accrued interest. In exercise of certain collection rights at that time, AmSouth was substituted for Dixie-Shamrock on certain division orders. This allowed AmSouth to receive Dixie-Shamrock's production run revenues which were AmSouth collateral. This was done immediately prior to the filing of Dixie-Shamrock's Chapter 11 petition.

As of the filing, the total amount owed by Dixie-Shamrock, including principal and accrued interest along with collection and attorney's fees, was in excess of $7,100,-000.00.

Testimony was presented on the value of the collateral by Michael Alexandre, president of Dixie-Shamrock, and Henry E. Cash, an assistant vice-president of AmSouth, both of whom are experienced petroleum engineers. In valuing the collateral, it was uncontroverted that the factors to be considered include oil and gas reserves and production rates, decline rates, market rates, operating expenses (including severance taxes and royalties) and a discount factor. While the court found Mr. Alexandre to be a credible witness, the court will adopt the evaluation of Mr. Cash, as his evaluation more appropriately considered actual production rates, as opposed to shut-in well tests; a discount rate of 11%; and, an articulated consideration of severance taxes. Mr. Cash estimates the value of the collateral as approximately $7,600,000.00.[2]

■ Under 11 U.S.C.A. § 362(d)(1) (West 1979) the court is required to grant relief from the automatic stay upon a showing that a creditor's interest is not adequately protected.[3] In a hearing under § 362(d), the party opposing relief from the stay has the burden of proof on the issue of adequate protection. *In re Hinton*, 30 B.R. 796, 798 (D.C.D.Tenn.1983); 11 U.S.C.A. § 362(g)(2) (West 1979).

The term "adequately protected" is not defined in the statute; however, some examples of types of protection are listed in § 361. One well established basis for finding adequate protection has been the existence of an "equity cushion." *Matter of Schaller*, 27 B.R. 959, 961–962 (D.C.D.Wis. 1983); *In re Mr. D. Realty Company*, 27 B.R. 359, 364 (Bkrtcy.S.D.Ohio 1983); *In re Automatic Voting Machine Corporation*, 26 B.R. 970, 972 (Bkrtcy.W.D.N.Y.1983); *In re Rogers Development Corporation*, 2 B.R. 679 (Bkrtcy.E.D.Va.1980). In utilizing the equity cushion approach, the courts have not fashioned a strict requirement as to the amount of equity cushion necessary to determine that a creditor is indeed adequately protected. Instead, the courts have evaluated the adequacy of a cushion amount on a case by case basis. *Matter of Schaller*, 27 B.R. 959, 962 (D.C.D.Wis. 1983); *In re Tucker*, 5 B.R. 180, 183 (Bkrtcy.S.D.N.Y.1980). Thus, courts have found creditors adequately protected based on the mere existence of an equity cushion. *In re Epstein*, 26 B.R. 354, 357 (Bkrtcy.E. D.Tenn.1982); *In re Gaslight Village, Inc.*, 8 B.R. 866, 871 (Bkrtcy.D.Conn.1981).

■ In determining the amount of equity cushion necessary to adequately protect a creditor, the court must not lose sight of either the policy's favoring rehabilitation or of the benefits derived from the automatic stay provisions. The protection provided a creditor under § 362(d)(2) should not be structured to provide the creditor with permanent security but should be structured to provide the creditor with interim protection while the debtor attempts to reorganize. *See In re American Mariner Indus-*

---

**2.** This court rejects AmSouth's argument that its collateral should be evaluated using liquidation value. The proper valuation for this reorganizing debtor must be based on a "going concern" value. *In re Automatic Voting Machine Corporation*, 26 B.R. 970, 972 (Bkrtcy.W.D.N.Y.1983).

**3.** 11 U.S.C.A. § 362(d)(1) (West 1979) provides in relevant part:

"(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying or conditioning such stay—
(1) for cause, including the lack of adequate protection of an interest in property of such party in interest; ...."

118

*tries, Inc.*, 27 B.R. 1004 (Bkrtcy.App. 9th Cir.1983).

 Based on the valuation provided by Mr. Cash, AmSouth is protected by an equity cushion of approximately $500,000.00. This cushion will insure them of adequate protection until it is eroded by Dixie-Shamrock through depletion of gas on a monthly basis. This depletion would be at least equal to the amount of the revenues subject to the division orders of AmSouth. The court assumes this is the minimum amount inasmuch as there was no proof that a withdrawal of the gas from the ground would reduce the value of the gas remaining because of increased production costs, etc.

Dixie-Shamrock has requested use of cash collateral which is now subject to the division orders of AmSouth. A debtor-in-possession, who pursuant to 11 U.S.C.A. § 1107 (West 1979) is vested with the same rights as a trustee, may under 11 U.S.C.A. § 363(c)(2)(B) (West 1979) use cash collateral upon the authorization of the court. Since AmSouth has objected to Dixie-Shamrock's use of cash collateral, this objection will be treated by the court as a request for adequate protection under 11 U.S.C.A. § 363(e) (West 1979). Thus, the court in granting Dixie-Shamrock's request to use cash collateral has limited that use in order to protect AmSouth.

The court is of the opinion that Dixie-Shamrock's use of cash collateral would be appropriate providing, however, that any cash collateral used by Dixie-Shamrock is used only to protect, maintain or enhance the collateral of AmSouth. It cannot be used for any purpose which would protect, maintain or enhance property subject to the partnership agreement in which Dixie-Shamrock has an undetermined interest, unless the partnership and all other affected parties provide AmSouth with a lien to the extent such cash collateral is used satisfactory to AmSouth. These funds can also be used for the purchase and production of new leases providing AmSouth receive a first priority lien in such properties to the extent their cash collateral is used. Said lien must be acceptable to AmSouth, which acceptance cannot be unreasonably withheld.

The court will further entertain any request by AmSouth to appoint an examiner for the purpose of monitoring the use of the cash collateral by Dixie-Shamrock.[4] The court, however, will not anticipate this action and will address any such request at the appropriate time.

IT IS, THEREFORE, SO ORDERED.

4. In a recent article, Judge Hershner addressed the practical advantages to a creditor in having the court appoint, pursuant to 11 U.S.C.A. § 1104(b) (West 1979), an examiner to monitor a debtor's use of cash collateral. Hershner, "Monitoring Cash Collateral: A Practical Approach," NORTON BANKRUPTCY LAW ADVISOR, Vol. 3 (December, 1983).