**In re CONCORD COAL CORPORATION.**

**CREDIT ALLIANCE CORPORATION, Appellant,**

v.

**CONCORD COAL CORPORATION, Appellee.**

Civ. A. No. 2:85–1539.

United States District Court, S.D. West Virginia, Charleston Division.

Jan. 13, 1988.

Stephen A. Weber, Kay, Casto & Chaney, Charleston, W.Va., for appellant.

Richard E. Rowe, Goodwin & Goodwin, Charleston, W.Va., for appellee.

Carl Frischkorn, Charleston, W.Va., trustee for Concord Coal.

## MEMORANDUM OPINION AND ORDER

HADEN, Chief Judge.

This is an appeal from an order of the bankruptcy court for this district. The Ap-

pellant, Credit Alliance Corporation ("CAC"), appeals a ruling which disallowed its claim against the estate of the debtor, the Appellee herein, Concord Coal Corporation ("Concord"). A record has been designated and the parties have briefed the issues.

## I. *Background* [1]

On November 1, 1978, Concord, then in the business of mining coal, purchased two pieces of mining equipment from Mountaineer Euclid, Inc. One was a Komatsu crawler tractor and the other was a Komatsu bulldozer. Both were quite expensive. As part of the financing arrangement for the purchase, Concord signed a "Conditional Sale Contract Note" which specified the terms of payment. The note also granted the seller a security interest in Concord's mining equipment and all of its inventory, goods, equipment, machinery, fixtures and assets of any and every kind. The seller, Mountaineer Euclid, assigned the Conditional Sale Contract Note to CAC on the same day as the sale.

CAC, as the assignee of the note, thereafter filed with the Clerks of the County Commissions of Kanawha and Logan County two sets of financing statements. The first set specified the mining equipment, the two Komatsus, as the property covered by the financing statements. The proceeds of the collateral were also covered by the financing statements. The second set of financing statements, also filed in Kanawha and Logan Counties, was identical to the first except that it pertained to the remainder of Concord's assets. There appears to be no question as to the correctness of the procedures followed by CAC in perfecting its liens.

In March of 1979, Concord became delinquent in its payments to CAC. Thereupon, CAC accelerated the balance due under the note, as was its right, and made a demand for immediate payment. Concord was unable to meet the demand. Thus, in July of 1979, CAC peacefully repossessed the equipment.

For a period of approximately three months, CAC unsuccessfully tried to dispose of the equipment by private sale. William G. Bagby, an assistant vice president of CAC, testified that he attempted to make a private sale by using CAC's own salesmen. Also, he put the equipment on a master repossession list and sent it to all offices around the country.

Not having any success with a private sale, and not wanting to hold the property through the winter, CAC decided to have a public auction in October of 1979. The auction was scheduled for October 26, 1979. CAC gave notice of the proposed auction to Concord on October 18. A notice of sale was published in the *Charleston Gazette* on October 23 and 25. A similar notice was published in the *Clarksburg Exponent* on October 24 and 25. The auction was held on the premises of Mountaineer Euclid at Jane Lew, West Virginia. It was poorly attended. In fact, an employee of Mountaineer Euclid was the only one who attended. Having received no bids, CAC purchased both pieces of equipment for a total of $80,000.00.

The evidence before the bankruptcy court as to the value and condition of the equipment was essentially as follows: Bagby of CAC characterized their condition as being "fair to poor." He testified that they had been "given rough useage" and "pretty well run into the ground." He estimated that cosmetic repairs to the equipment alone would cost approximately $15,000.00. He offered no opinion as to the internal condition of the equipment, but estimated that major engine overhauls, if needed, would cost from $40,000.00 to $50,000.00. Hence, he opined that $80,000.00 was a reasonable minimum sum. He also admitted that the equipment perhaps could have been sold for $20,000.00 more, but believed that as "an under-the-hammer, minimum value of equipment in that condition, under those market conditions that [$80,000.00] was a minimum reasonable sum."

---

1. This statement of facts is taken from the transcript of the May 30, 1985, hearing before the bankruptcy court, the briefs of the parties and the memorandum opinion of the bankruptcy court, all of which this Court has reviewed.

Bagby admitted that he had never seen the equipment in question. His opinion was based upon photographs and condition reports. He professed, however, to having expertise in the sale of repossessed equipment. He also testified to being generally familiar with Komatsu bulldozers and other mining equipment. CAC did not, however, engage an independent appraiser to appraise the equipment.

After offsetting the auction sale price of $80,000.00 against the remaining debt on the equipment, CAC calculated the deficiency at $333,638.27. CAC then sued Concord in New York for the deficiency. CAC received a judgment, but it was vacated for unspecified procedural deficiencies. CAC took no further action on its claim against Concord until 1984.

Concord filed a Chapter 11 petition in this district on October 14, 1980. CAC was not listed as a creditor in Concord's schedules. Hence, CAC did not receive notice of the petition. CAC claims that it did not become aware that Concord had filed for bankruptcy until February or March of 1984. It filed a proof of claim with the bankruptcy court on March 27, 1984, asserting secured status on a claim of $365,-705.34. The bar date for filing a proof of claim was May 18, 1982. Thus, CAC's proof of claim was tardy. Concord's third amended plan of reorganization was confirmed on November 2, 1984. CAC's claim was not provided for in the plan.

On March 27, 1985, CAC filed an adversary proceeding and a motion to lift the stay in the main case. The two were consolidated for a hearing before the bankruptcy court on May 30, 1985. After hearing testimony from William Bagby and Carl Frischkorn, Trustee, the court invited written argument from counsel. Thereafter, on October 27, 1985, the bankruptcy court issued its "Memorandum Order Denying Deficiency Claim of Credit Alliance Corporation."

The bankruptcy court's ruling was of a three-fold nature. First, it held that CAC's actions with respect to its claim against Concord constituted laches. This in and of itself was sufficient in the bankruptcy court's view to deny CAC's claimed deficiency. Second, the bankruptcy court ruled that CAC did not conduct its sale of the mining equipment in a commercially reasonable manner. Third, related to the second ruling, the court determined that CAC failed to overcome the presumption that the value of the equipment repossessed was equal to the amount of the indebtedness it secured. CAC appeals.

## II. *Discussion*

### A. *Standard of Review*

■ The initial controversy between the parties is the standard of review which this Court should employ in examining the rulings of the bankruptcy court. Concord, being successful below, urges a "clearly erroneous" standard. CAC, on the other hand, argues that the Court should make a *de novo* review of the bankruptcy court's decision. The Court believes that its task necessarily involves both standards.

Bankruptcy Rule 8013 provides as follows:

"On an appeal the district court or bankruptcy appellate panel may affirm, modify or reverse a bankruptcy court judgment, order or decree or remand with instructions for further proceedings. Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses."

CAC argues, however, that the above rule, as relied upon by Concord, is invalid. CAC points out that the Fourth Circuit declared Rule 8013's predecessor, Rule 810 of the Rules of Bankruptcy Procedure, to be unconstitutional. *1616 Reminc Ltd. Partnership v. Atchison & Keller,* 704 F.2d 1313 (4th Cir.1983). "The *Reminc* Court held that rule 810 of the Rules of Bankruptcy Procedure, which directs the district court to uphold the bankruptcy judge's factual findings unless clearly erroneous, impermissibly invested the non-Article III bankruptcy judge with judicial power to decide state law claims." *In Re Twin Parks Ltd. Partnership,* 720 F.2d 1374, 1375 n. 5 (4th Cir.1983).

The Fourth Circuit's decision in *Reminc* was narrow. It restricted only the authority of a bankruptcy court to determine "a 'traditional' state common-law action, not made subject to a Federal Rule of Decision and related only peripherally to an adjudication of bankruptcy under federal law...." 704 F.2d at 1318 (*quoting Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 92, 102 S.Ct. 2858, 2882, 73 L.Ed.2d 598 (1982) (Burger, C.J., dissenting)). Moreover, the Fourth Circuit has put the *Reminc* decision in perspective given the distinction presently drawn between so-called "core" and "non-core" proceedings.

> "The constitutional limitation identified in *Reminc* does not apply, therefore, when the bankruptcy court determines a matter closely related to an adjudication of bankruptcy under federal law. To the contrary, the 'application of the clearly erroneous standard has been "routinely upheld" in proceedings within the core area of the federal bankruptcy power.' [cites omitted] [T]his distinction between core and non-core matters is reflected in the appellate review provisions of the bankruptcy amendments and Federal Judgeship Act of 1984, § 104(a), Public Law No. 98–353, 98 Stat. 333 (codified at 28 U.S.C. §§ 157(c)(1), 158(c)). Under that statute findings of fact rendered in 'core proceedings' receive clearly erroneous deference ... while findings in non-core proceedings must be reviewed *de novo*."

*Harman v. Levin*, 772 F.2d 1150, 1153 n. 3 (4th Cir.1985). The issue then, properly phrased, is whether the proceeding before the bankruptcy court falls within the core area of the federal bankruptcy power. The Court believes it does.

CAC implicitly argues that the proceeding was of a non-core nature in that issues of state law were raised. The Court agrees that state law is relevant. But the controlling statute explicitly provides that "[a] determination that a proceeding is not a core proceeding shall not be made solely on the basis that its resolution may be affected by State law." 28 U.S.C. § 157(b)(3). The Court recognizes, of course, the power of a court to declare such a statute unconstitutional. The Fourth Circuit did just that in *Reminc*. The wording above quoted, however, is not mandatory in its content; it offers guidance only. It urges the Court away from a black and white analysis on the core versus non-core determination. The Court rejects CAC's argument that because state law was relevant to the bankruptcy court's decision-making, the decision rendered is not due the deference accorded by the clearly erroneous standard. The statute now governing [2] bankruptcy court procedures provides in part that the following shall be deemed "core proceedings":

> "(F) proceedings to determine, avoid, or recover preferences;
>
> (G) motions to terminate, annul, or modify the automatic stay;
>
> \* \* \* \* \* \*
>
> (I) determinations as to the dischargeability of particular debts;
>
> \* \* \* \* \* \*
>
> (k) determinations of the validity, extent, or priority of liens;
>
> \* \* \* \* \* \*
>
> (O) other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims."

28 U.S.C. § 157(b)(2). It appears to the Court that an element of each of the above was before the bankruptcy court when it made the decision appealed from.

Moreover, the Court cannot say that those core areas outlined by the statute offend the values protected by the Supreme Court in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), and the Fourth Circuit in *Reminc*. Hence, the Court concludes that as to any findings of fact made by the bankruptcy

---

2. The statute was in effect on the date the bankruptcy court rendered its decision as well as the date it received evidence and heard argument. The effective date of the statute is July 10, 1984.

court, a clearly erroneous standard is appropriate.

CAC also contends that a clearly erroneous standard should not be employed with regard to conclusions of law made by the bankruptcy court. As to this contention, the Court agrees. While findings of fact will be affirmed unless a review of the record leaves a "definite and firm conviction that a mistake has been committed," *Harman v. Levin*, 772 F.2d 1150, 1153 (4th Cir.1985), this Court "must independently determine the correctness of the ultimate legal conclusion adopted by the bankruptcy judge on the basis of the facts found." *Matter of Hammons*, 614 F.2d 399, 403 (5th Cir.1980).

## B. *Laches*

■ The bankruptcy court's primary reason for denying CAC relief was its determination that the latter was guilty of laches. It faulted CAC for exhibiting "an unexplainable lack of diligence" for failing "to take any action to collect its deficiency claim against Concord for four years." Bankruptcy court's memorandum opinion at 5. Hence, the bankruptcy court held that CAC was estopped from asserting its deficiency claim.

Laches is an equitable measure traditionally employed by courts to prevent one party from being unfairly prejudiced by another's delay. The bankruptcy court relied upon *Mundy v. Arcuri*, 165 W.Va. 128, 267 S.E.2d 454 (1980), wherein the West Virginia Supreme Court of Appeals articulated its understanding of the doctrine.

"Where a party stands by and sees another who, in good faith, deals with property inconsistent with the first person's interest and that person makes no objection, he is estopped to deny the validity of the action on the part of the second person.... *Thaxton v. Beard*, 157 W.Va. 381, 201 S.E.2d 298 (1973), Syllabus Point 2. Where a party knows his rights or is cognizant of his interest in a particular subject-matter, but takes no steps to enforce the same until the condition of the other party has, in good faith, become so changed, that he cannot be restored to his former state if the right be then enforced, delay becomes inequitable, and operates as an estoppel against the assertion of the right. This disadvantage may come from death of parties, loss of evidence, change of title or condition of the subject-matter, intervention of equities, or other causes. When a court of equity sees negligence on one side and injury therefrom on the other, it is a ground for denial of relief. *Carter v. Price*, 85 W.Va. 744, 102 S.E. 685 (1920), Syllabus Point 3."

*Id.* at 133, 267 S.E.2d at 457.

The Court has carefully reviewed the arguments of counsel and the controlling law and is of the firm impression that the doctrine of laches was misapplied in this case.

It is undisputed that CAC did not receive notice either of Concord's filing for bankruptcy or of any proceedings held in regard thereto. It is also undisputed that Concord had a positive duty to list all of its creditors on the schedules filed with the bankruptcy court. 11 U.S.C. § 521(1). Concord did not list CAC as a creditor. Implicit in the holding of the bankruptcy court—and explicitly argued by Concord—is the assertion that if CAC had pressed its claim, rather than sitting on it for four years, the trustee or Concord would have been aware of its claim and would have included such in the appropriate schedule. CAC was not, however, under any explicit duty to prosecute its claim. On the other hand, Concord was under a duty to notify CAC of its bankruptcy petition.

Concord's implicit assertion that it did not know of CAC's claim is incredible almost as a matter of law. It must be remembered when Concord filed its bankruptcy petition. It did so on October 14, 1980. Hence, it is not as if CAC had been sitting on its claim for four years *before* Concord filed for bankruptcy. Concord knew of CAC's claim for a deficiency and knew that CAC had filed suit for same in the state of New York. That the judgment received in New York was vacated on procedural grounds should not have led Con-

cord to believe that CAC had abandoned its claim.

■ The bankruptcy court indicated that it disbelieved CAC's contention that it had no actual knowledge of Concord's bankruptcy until 1984. That finding, however, is not supported by any evidence in the record. Concord certainly did not introduce any evidence tending to prove actual knowledge on the part of CAC. Having failed to give notice to CAC, Concord had the burden of proof on that issue. *In the Matter of Robertson,* 13 B.R. 726 (Bkrtcy. E.D.Va.1981). What the evidence does show is that once CAC became aware of the bankruptcy, it filed a claim with the bankruptcy court. There was no evidence tending to show why CAC would delay filing a claim against the debtor's estate if it had actual knowledge of the filing. Logic supports action to the contrary. In sum, the conclusion that CAC knew of Concord's bankruptcy is speculative at best.

The bankruptcy court opined that "CAC's failure to pursue [its] deficiency while Concord's other creditors prosecuted their claims in bankruptcy raised in those creditors a reasonable reliance upon the status of the claims they were pursuing." Bankruptcy court's Memorandum Opinion at 5. There may indeed have been reliance on the part of the other creditors, but such reliance would only have been reasonable if CAC had been given the statutorily required notice and thereafter had failed to assert its rights.

■ Inasmuch as laches is an affirmative defense, Concord has the burden of proving inexcusable or inadequately excused delay on the part of CAC. *Giddens v. Isbrandtsen Co.,* 355 F.2d 125 (4th Cir. 1966). The delay which is relevant is CAC's delay in making a claim against the estate. It is only that delay which caused, or will now cause, prejudice to the reorganization plan. And that delay was caused by Concord. *But for* Concord's breach of its absolute duty to list CAC as a creditor and to give notice to CAC, there would have been no delay in bringing CAC into the picture. In essence, Concord is asking, with unclean hands, that equity be done.

To reiterate, any prejudice now claimed by Concord is of its own making.

The bankruptcy court held also that CAC was guilty of laches for choosing to file a motion and an adversary proceeding rather than attempting to intervene in the reorganization plan. CAC argues that it was under no requirement to so limit its remedies. It points out that the bankruptcy court cited no authority to support a proposition to the contrary. This Court notes that Concord likewise has failed to offer authority to support the bankruptcy court's position. Hence, the Court must conclude that CAC was within its rights in choosing the course it took.

C. *Commercial Reasonableness of the Sale*

As an alternate ground for denying CAC's claim for deficiency, the bankruptcy court held that CAC's claim of the repossessed equipment was done in a commercially unreasonable manner. In this conjunction, it further held that CAC had not rebutted the resultant presumption that the fair market value of the equipment was equal to the amount of indebtedness the equipment secured.

The bankruptcy court's finding of commercial unreasonableness was based upon two factors: (1) the "delay of CAC in disposing of the mining equipment" and (2) CAC's manner of advertising the public sale.

■ From the time CAC repossessed the equipment until the time it was sold at public sale, ninety days elapsed. The bankruptcy court believed this ninety-day period to be unreasonable. This Court must respectfully disagree. Such a holding is supported neither by the law nor the undisputed facts.

The Uniform Commercial Code, as adopted by West Virginia, does not set a specific time period for disposition of collateral. The Code requires only that the time of disposition be "commercially reasonable." *W.Va.Code,* § 46–9–504(2). Judge Flowers noted in *In Re 5–Leaf Clover Corp.,* 6 B.R. 463 (Bkrtcy.S.D.Va.1980),

that "[t]he time required to make a commercially reasonable disposition of the collateral will vary according to the nature of the collateral and the condition of the market in which it will be sold." *Id.* at 467.

The evidence revealed that CAC was attempting to sell the equipment during the ninety-day period to a "private buyer." It did so by utilizing its own salesmen and by putting the equipment on a master repossession list which was sent to all of CAC's offices around the country. A private sale is obviously a much preferred method of selling. A deliberately negotiated sale will generally produce a better deal for the seller as well as avoid the uncertainty associated with the auction block. A creditor should be given ample opportunity to explore the prospects for a private sale if commercially reasonable to do so. Such is in the best interest of all involved.

This Court does not believe that ninety days is a commercially unreasonable period to attempt a private sale of large mining equipment. The pieces of equipment involved, a Komatsu crawler tractor and a Komatsu bulldozer, are not the type which can be disposed of easily. These were not farm tractors or utility trucks whose potential users in a given area would tend to be plentiful. Indeed, their market in good times would be somewhat limited. The evidence was undisputed that the coal industry in 1979 had fallen upon hard times. The demand for equipment was low.

In holding that ninety days was a commercially unreasonable period of time, the bankruptcy court relied upon Judge Flowers' holding in *In Re 5-Leaf Clover Corp., supra,* that thirty to sixty days was a commercially reasonable period of time to effect a sale of equipment of the type at issue here. The Court agrees with CAC, however, that Judge Flowers' decision is not controlling. Judge Flowers' observation as to the appropriate time period was dicta. It was not necessary to a decision on the issues before him. He offered that time period in a vacuum of facts. The equipment in question had not been sold. It had not even been repossessed. It was still in the hands of the debtor.

■ Finally, there is the bankruptcy court's determination that CAC's notice of the sale was inadequate. Again, this Court regrets that it must disagree with the bankruptcy court's decision. The case law supports CAC's contention that the notice was commercially reasonable.

The form of the newspaper notices is not before the Court. In any event, neither Concord nor the bankruptcy court take issue with the notices' content. There is no allegation that the notices were not specific or accurate as to time, place or subject matter. The only aspect of the public notice under attack is its timing. A notice of sale was published in a Charleston newspaper on October 23 and 25, 1979. A similar notice was published in a Clarksburg newspaper on October 24 and 25, 1979. The sale was held on October 26, 1979.

The bankruptcy court held that "a mere three days" notice of the scheduled public sale was commercially unreasonable. In so holding, the bankruptcy court relied upon *Matter of Appalachian Pocahontas Coal Company, Inc.,* 31 B.R. 579 (S.D.W.Va. 1983). It cited that case as standing for the proposition "that where the first newspaper advertisement publishing notice of a public sale of mining equipment did not appear until three days before the scheduled sale, such sale was conducted in a commercially unreasonable manner." Bankruptcy court's memorandum opinion at 8. Unfortunately, the bankruptcy court has misconstrued the holding of the above cited case. It is true that in that case the first newspaper advertisement appeared three days before the sale. Judge Copenhaver's principal reason, however, for affirming the bankruptcy court's finding of commercial unreasonableness was the defective nature of the public notice. It apparently misdescribed the location of the sale. This "defect was aggravated by the fact that the first local newspaper advertisement of the sale did not appear until three days before the sale, and the questionable manner in which the sale was conducted." 31 B.R. at 581. The "questionable manner" regarding the sale involved the sale of equipment on a lot versus individual basis. Hence, Judge Copenhaver did

not hold, all other elements being equal, that three days notice was commercially unreasonable.

The Code does not explicitly require that notice of a public sale be published. In fact it does not mention a public notice at all. It merely requires that "reasonable notification of the time and place of any public sale ... shall be sent by the secured party to the debtor...." *W. Va. Code*, 46–9-504(3). CAC complied with this requirement. As regards the timing of a public notice, other courts have held that a short notice is commercially reasonable. *Credit Alliance Corp. v. David O. Crump Sand & Fill*, 470 F.Supp. 489 (S.D.N.Y.1979) (four days notice); *Credit Alliance Corp. v. B & P Excavating, Inc.*, 31 U.C.C. 1784 (S.D.N.Y.1981) (four days notice) (applying West Virginia law); *Leasing Service Corp. v. Carbonex, Inc.*, 512 F.Supp. 253 (S.D.N.Y.1981) (five days notice); *Leasing Service Corp. v. Diamond Timber, Inc.*, 559 F.Supp. 972, 36 U.C.C. 1075 (S.D.N.Y.1983) (seven days notice). The Court's research reveals no cases to dispute CAC's assertion that three days notice has never been held in and of itself to constitute commercial unreasonableness.

Another feature of the public sale, not discussed by the bankruptcy court, which favors a finding of commercial reasonableness is found in the testimony of William Bagby, Assistant Vice President of CAC. He testified that notices of the public sale were sent to ten to twenty various customers of CAC who may have had like equipment, "to stir up and drum up some buyers." Transcript at 16. The Court rejects Concord's argument that Bagby was uncertain as to whether these notices were sent; the uncertainty went to the number of customers contacted by this method.

Finally, the fact that the sale was poorly attended and that CAC, the secured party, was the sole bidder does not make the sale commercially unreasonable. *Credit Alliance Corp. v. David O. Crump Sand & Fill*, 470 F.Supp. 489 (S.D.N.Y.1979).

### III. *Conclusion*

Based upon the undisputed facts and the applicable law, the Court concludes that error was committed below. The Court regrets any hardship which this decision may cause to the parties involved in the reorganization plan of Concord. Every Chapter 11 reorganization could be conducted more easily, however, if the lawful claims of some creditors could be discarded.

Because the Court finds that the sale of the equipment involved was commercially reasonable, no discussion is offered of the bankruptcy court's connected holding that CAC had failed to overcome the presumption that the value of the equipment repossessed was equal to the amount of indebtedness the equipment secured. The commercially reasonable resale of repossessed collateral normally concludes the inquiry; a court will look no further than the public auction. In the interest of fairness, however, the Court believes it proper to take a limited look behind that sale for additional information regarding the fair market value of the equipment. The Court assumes CAC is not in the mining business. The Court further assumes that CAC has disposed of the equipment. Concord should be allowed on remand to inquire into the facts and circumstances of any disposition.

The Court hereby reverses the judgment of the bankruptcy court and remands the case for further proceedings not inconsistent herewith.