**NEW HOLLAND CREDIT COMPANY, LLC, Plaintiff,**

v.

**MADISON CREEK LLC, et al., Defendants.**

No. Civ.A. 2:01–0327.

United States District Court, S.D. West Virginia, Charleston Division.

March 21, 2002.

696

Michael T. Chaney, Kay, Casto & Chaney, PLLC, Charleston, West Virginia, for plaintiff.

O. Reginald Osenton, Osenton & Adkins, LLP, Logan, West Virginia, for defendants.

### MEMORANDUM OPINION AND ORDER

HADEN, Chief Judge.

Pending is Plaintiff's motion for summary judgment. The Court **GRANTS** in part and **DENIES** in part Plaintiff's motion.

### I. FACTUAL BACKGROUND

On August 6, 1999 Defendant Madison Creek LLC (Madison Creek) purchased under a Retail Installment Sales Contract and Security Agreement (Contract) a used Kawasaki wheel loader from Campbell Tractor & Equipment Co., Inc. Defendant Michael L. White acted on Madison Creek's behalf during the sale process. He also executed a personal guaranty for the payments. Campbell Tractor & Equipment ultimately assigned the Contract and Guaranty to Plaintiff New Holland Credit Company LLC (New Holland).

Madison Creek operated a coal mine in Logan County. It purchased the equipment to load its coal trucks. The Contract reveals the following terms:

| | | |
|---|---|---|
| A. | Cash Price | $128,700.00 |
| B. | Down Payment | 5,000.00 |
| C. | Trade-in Allowance | 31,175.00 |
| D. | "Official Fees" | 10.00 |
| E. | UCC Fees | 12.50 |
| F. | "Document Fees" | 300.00 |
| G. | Amount Financed | $ 92,847.50 |

The Contract contained the following provisions pertinent here:

3. **SECURITY INTEREST:** You give the Creditor a security interest in (i) the Property.... This secures payment of all amounts you owe in this contract ... or when assigned, New Holland Credit Company, LLC....

4. **DEFAULT:** You shall be in default under this contract if any one or more of the following events of default occur: (i) you fail to make any payment when it is due.... In addition to or as an alternative to the foregoing the Creditor may repossess the Property. To the extent permitted by law you waive notice of dishonor, presentment and demand of this contract.

If the Property is repossessed and is not redeemed by you in accordance with any notice given you, it will be sold. The proceeds of the sale plus insurance proceeds (if any), but less costs of repossessing, transporting, repairing, refurbishing and selling the Property, and less attorneys fees and legal costs in-

curred in obtaining possession of the Property, will be applied to remaining sums due under the contract.... If there is a deficiency ... demand will be made for payment of the deficiency. You will pay the amount of the deficiency upon demand. To the extent permitted by law, you agree to pay attorney fees and legal costs incurred by Creditor if suit is brought to collect any deficiency by an attorney who is not an employee of Creditor.

....

12. **OTHER AGREEMENTS:** Any change to this contract must be in writing and signed by you and the Creditor....

(Ex. 1, Pl.'s Mot.Summ.J. at 3.)

Shortly after purchasing the wheel loader, Madison Creek hit an underground rock formation at its mine. The formation proved to be formidable. Comparatively little coal was mined from the site thereafter.[1]

Once White realized the rock was basically impenetrable, he contacted New Holland. White advised the creditor he would not be able to make any payments on the wheel loader. A New Holland official suggested a "friendly surrender" of the wheel loader. White understood the offer to mean New Holland would repossess the wheel loader, retain the trade-in loader, receive two payments on the repossessed wheel loader, and not pursue any deficiency.

It is undisputed White parked the wheel loader in September 1999 when it became apparent Madison Creek could not make the payments. (Dep. of Michael L. White at 14 ("I didn't want anything to happen to it because they were good to me. They let me use it and let me try to get through the rock. I didn't want nothing to happen to their loader.")). The wheel loader was used at the mine only for approximately one month.

On February 9, 2000 New Holland repossessed the loader per the understanding with White. The next day, New Holland sent White a Notice of Repossession and Right to Redeem. The Notice advised Madison Creek could recover the wheel loader by paying the unpaid balance of $98,278.16. The Notice also cautioned "The sale price might not cover our debt and expenses. If this happens, you'll owe the difference to us or the dealer." (Ex. C, Aff. of Mark Steffy, Pl.'s Mot. for Summ.J.) The Notice also contained the following provision:

**NOTICE OF SALE**

☒**PRIVATE SALE:** The property described above will be sold at a private sale at any time after 10 days from the date of notice shown above unless redeemed by you prior to such sale.

☐ **PUBLIC SALE:** The property described above will be offered for sale at public auction to the highest bidder on the date (or any adjournment thereof) and at the time and place indicated below unless redeemed by you prior to such sale.

*Id.* The "**PUBLIC SALE**" box was not checked. Neither this nor any subsequent notice was provided to Defendants for the time or place of a public sale.

Defendants did not redeem the wheel loader. Consistent with the Notice, New

---

1. Production totals were as follows:

| | |
|---|---|
| August 1999 | 3428.47 tons |
| September 1999 | 1594.44 tons |
| October 1999 | 147.10 tons |
| November 1999 | 1810.62 tons |

(Exs. B1–B4, Defs.' Resp. to Mot. for Summ. J.) White testified the loader was in "mint shape" when repossessed. (Dep. of Michael L. White at 13.)

Holland attempted to sell the wheel loader through its Remarketing Department. The Remarketing Department first attempted to sell the wheel loader through a network of more than 1,200 dealers. Unfortunately, the highest offer received for the wheel loader was $20,000.00. New Holland then offered the wheel loader for sale at a large construction equipment auction conducted on September 20–21, 2000.

Prior to the auction, 25,924 advertising brochures were mailed out to various potential buyers. Notice and details regarding the auction were also posted on the auctioneer's website. According to the auctioneer's records, 1,107 bidders and potential bidders attended the auction, and more than 2,000 items of equipment were sold, including more than 70 wheel loaders and track loaders.

The repossessed wheel loader was sold for $16,000.00. After deducting necessary commissions and expenses, the net sale proceeds were just $13,040.00. Neither White nor Madison Creek received notice of the auction sale. On November 20, 2000, however, New Holland did give Defendants a Notice Of Final Accounting, advising them of an $86,677.91 deficiency.

## II. DISCUSSION

### A. *The Summary Judgment Standard*

Our Court of Appeals has often stated the settled standard and shifting burdens governing the disposition of a motion for summary judgment:

Rule 56(c) requires that the district court enter judgment against a party who, "after adequate time for ... discovery fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," To prevail on a motion for summary judgment, the [movant] must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) it is entitled to judgment as a matter of law. In determining whether a genuine issue of material fact has been raised, we must construe all inferences in favor of the [the nonmovant]. If, however, "the evidence is so one-sided that one party must prevail as a matter of law," we must affirm the grant of summary judgment in that party's favor. The [nonmovant] "cannot create a genuine issue of fact through mere speculation or the building of one inference upon another," To survive [the motion], the [nonmovant] may not rest on [his] pleadings, but must demonstrate that specific, material facts exist that give rise to a genuine issue. As the *Anderson* Court explained, the "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff[.]"

*Harleysville Mut. Ins. Co. v. Packer,* 60 F.3d 1116, 1119–20 (4th Cir.1995) (citations omitted); *Shaw v. Stroud,* 13 F.3d 791, 798 (4th Cir.), *cert. denied,* 513 U.S. 813, 115 S.Ct. 67, 68, 130 L.Ed.2d 24 (1994); *see also Cabro Foods, Inc. v. Wells Fargo Armored Service Corp.,* 962 F.Supp. 75, 77 (S.D.W.Va.1997); *Spradling v. Blackburn,* 919 F.Supp. 969, 974 (S.D.W.Va.1996).

"At bottom, the district court must determine whether the party opposing the motion for summary judgment has presented genuinely disputed facts which remain to be tried. If not, the district court may resolve the legal questions between the parties as a matter of law and enter judgment accordingly." *Thompson Everett, Inc. v. National Cable Advertising, L.P.,* 57 F.3d 1317, 1323 (4th Cir.1995).

### B. *Applicable Law*

The Court must first determine the applicable law. Article 9 of the Uniform

Commercial Code (UCC) governs secured transactions—transactions which involve the granting of credit secured by personal property. *West Virginia Code* § 46–9–102 provides Article 9 applies "to any transaction . . . which is intended to create a security interest in personal property." *Id.* Paragraph 3 of the Contract plainly creates a security interest. Accordingly, Article 9 applies to the transaction.

In 1963, the Legislature adopted the UCC and, in the process, ushered in a new era in commercial transactions law. The UCC has been amended periodically by the National Conference of Commissioners on Uniform State Laws. The Legislature often correspondingly amends the West Virginia version. An amendment to the West Virginia UCC was adopted in 2000, sandwiched between some of the events in this case. Thus, the Court must determine whether the pre- or post-amendment version of the West Virginia UCC applies. That effort is complicated somewhat, because the recent amendment contained two different effective dates.

A legislative enactment originating as Senate Bill 469, and passed during the 2000 Regular Legislative Session, notes in summary "This act entirely revises the secured transactions article of the Uniform Commercial Code. The changes were mostly based upon a proposal approved by the National Conference of Commissioners on Uniform State Laws in 1999." West Virginia Legislature, *2000 Bill Summaries* 49–50 (2000), *available at* http://www.legis.state.wv.us/legishp.html. The Legislature's official *2000 Bill Summaries* listed the Act's effective date as June 1, 2000.

One would thus assume the June 1, 2000 effective date controls. The Legislature, however, also added a "trojan-horse" effective date to the Act itself in Section 46–9–701. That provision states "This article takes effect on the first day of July, two thousand one." W.Va.Code § 46–9–701.

The conflicting dates leave some room for debate as to the actual effective date.

█ In the Official Comment to Uniform Commercial Code 9–701, however, the Commissioners stated:

> [T]his section contemplates that states will adopt a uniform effective date for this article. Any one state's failure to adopt the uniform effective date will greatly increase the cost and uncertainty shrouding the transition.

*See* W.Va.Code § 46–9–701, official comment. Given this strong statement by the Commissioners, it is unlikely the Legislature would have disrupted the transitional scheme intentionally. Accordingly, the Court treats the effective date of the amendments to the West Virginia UCC as July 1, 2001. The events in this case all occurred prior to that date. Accordingly, pre-amendment Article 9 controls.

### C. The Alleged Modification

Defendants first assert the "friendly surrender" discussion relieves them of any obligation to satisfy a deficiency. In sum, Defendants assert a New Holland agent offered not to pursue a deficiency judgment if Madison Creek surrendered the wheel loader and made no claim on its earlier trade in. Defendants cite *Simpson v. Mann,* 71 W.Va. 516, 76 S.E. 895 (1912) in support. The lone Syllabus in *Simpson* held:

> Though a written unsealed building contract provides that no alterations or additions shall be allowed or paid for unless the same and the cost thereof be agreed to in writing in advance, and no change or modification of the contract shall be recognized unless evidenced by agreement in writing, yet a modification may be made by oral contract between its parties.

*Id.* at 516, 76 S.E. at 895.

The Supreme Court of Appeals of West Virginia has noted, however, *Simpson* is

"the exception to th[e] rule." *Pasquale v. Ohio Power Co.*, 186 W.Va. 501, 505, 413 S.E.2d 156, 160 (1991). Further, while the West Virginia version of the UCC would permit proof of waiver of the Contract's modification provision under some circumstances, *see* W.Va.Code § 46–1–107, the Contract appears to nullify that option as well. (*See* Ex. 1, Pl.'s Mot.Summ.J. at 3) ("The failure by Creditor to exercise any right or remedy after an event of default occurs shall not be a waiver of the Creditor's rights or remedies, and Creditor may exercise its rights or remedies if the same event of default continues. . . .").

■ The Court concludes the Contract's unambiguous language requires any and all modifications be in writing and signed by both parties. Defendants' claimed modification was oral, and hence not effective under the Contract. The Court **GRANTS** New Holland's motion for summary judgment on the issue of modification.

### D. Commercial Reasonableness and Notice

Article 9 provides liberal remedies to a creditor faced with a defaulting purchaser. *West Virginia Code* Section 46–9–504 provides both tools, and safety mechanisms, for a creditor hoping to cut its losses after default:

(1) A secured party after default may sell, lease or otherwise dispose of any or all of the collateral in its then condition or following any commercially reasonable preparation or processing. . . .

(2) If the security interest secures an indebtedness, the secured party must account to the debtor for any surplus, and, unless otherwise agreed, the debtor is liable for any deficiency. . . .

(3) Disposition of the collateral may be by public or private proceedings and maybe made by way of one or more contracts. *Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable.* Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, *reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor, if he has not signed after default a statement renouncing or modifying his right to notification of sale.*

W.Va.Code § 46–9–504 (emphasis added).

As the underscored portions indicate, the creditor's remedies are not without limitation. In their respected treatise, Professors James J. White and Robert S. Summers summarized the limitations and their respective rationales:

[Section] 9–504 . . . impose[s] *two requirements* upon the reselling creditor: (1) the creditor must send notice; and (2) every aspect of the sale including the: method, manner, time, place, and terms must be *"commercially reasonable."* The notice requirement is easy to understand and to apply; *it is inspired by the usually forlorn hope that if he is notified, the debtor will somehow acquire enough money to redeem the collateral or send his friends to bid for it.*[2]

---

**2.** Indeed, White avers:

If I had known the time and place that the loader would be made available for purchase after I surrendered it . . . I would have made arrangements to purchase the loader . . . [or]

would have informed business associates that they could have purchased the loader for a very low price. . . .

(Aff. of Michael L. White ¶ 10.)

The second condition is both more important and more difficult to define in operational terms. Its importance lies in the fact that the amount of the deficiency judgment will be inversely proportional to the sales price; if the price is high, the amount of the judgment will be low, and vice versa. The "method, manner, time, place and terms" tests are really proxies for "insufficient price," and their importance lies almost exclusively in the extent they protect against an unfairly low price.

4 James J. White & Robert S. Summers, *Uniform Commercial Code* § 34–10 (4th ed.1995 and Supp.2001) (emphasis added) (citing cases).

■ Lingering questions remain as to both the commercial reasonableness of the sale and proper notice. Regarding the first issue, Section 46–9–504(3) provides a sale or disposition "including the method, manner, time, place and terms" must be commercially reasonable. *Id.* New Holland stresses those facts indicative of commercial reasonableness, including wide advertisement of the sale, the use of an established auctioneer, and the attendance at auction of roughly 1100 people.

In contrast, Defendants assert commercial unreasonableness is evidenced by several non-exclusive problems with the auction advertisement and sale. First, Defendants note the low price obtained for the wheel loader.[3] The equipment was purchased in August 1999 for $128,700.00 and used for approximately one month. White asserts the loader was

---

**3.** New Holland asserts Defendants are limited to challenging price alone on the issue of commercial reasonableness. The argument stems from the following exchange during White's deposition:

Q. In the counterclaim that's been filed on behalf of you and/or Madison Creek, it says that the sale of the wheel loader at the private sale was not commercially reasonable. Do you know the basis for that?
A. Yes. The loader was worth a lot more than $16,000.00. The wheels on it cost more than $16,000.00
Q. So the basis for that statement is the fact that it apparently sold for only $16,000.00?
A. That's correct.
....
Q. Right. But it's simply the price that they got for it, that's your only basis for saying that it was not a commercially reasonable sale; is that right?
A. Yes.

(Dep. of Michael L. White at 38–39.) New Holland, relying on *Barwick v. Celotex Corp.*, 736 F.2d 946 (4th Cir.1984), asserts White may not now depart from his sole reliance on price in his deposition by subsequent affidavit suggesting additional sale defects.

*Barwick* observed "A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct." *Id.* at 960. That principle is inapplicable here.

The courts and practitioners have struggled with the concept of commercial reasonableness since its appearance in Article 9. *See* L.B. Wilkinson, Jr., Comment, *Procedures v. Proceeds: Evaluation of the Commercial Reasonableness of Dispositions of Collateral Under Article Nine of the Uniform Commercial Code*, 63 Tenn.L.Rev. 987, 987 (1996) ("This standard is vaguely defined by the Code, and interpretation by the courts throughout jurisdictions and even within jurisdictions has been anything but uniform.... The result of this indecision has led to confusion among creditors regarding what steps are needed to conduct a sale that will not be challenged. The indecision has also led to uncertainty among attorneys rendering legal advice."). Indeed, none other than Grant Gilmore, the principal drafter of Article 9, observed " 'the duty is a vague and fluctuating one, which cannot be meaningfully described except in terms of particular fact situations.' " *Id.* at 996 (quoted authority omitted).

*Barwick* and its progeny are not designed to hold a lay deponent to his unschooled factual testimony on perhaps one of the most vaporous concepts of commercial law. White should not be penalized for a lack of appreciation of all the elements which might lead a seasoned practitioner to conclude a commercially unreasonable sale had occurred.

in mint-condition when returned, the same shape in which he originally purchased it. Nonetheless, the wheel loader was sold to the highest bidder for only $16,000.00, just over 10% of its original purchase price. Indeed, New Holland appears to concur the sale price was very low. According to "A Collector History Inquiry," apparently drafted by a New Holland representative, it was agreed "This equip is going for about $50K. The condition report doesn't reflect anything really being wrong with the Equip.... *We agree that the sale of the equ[i]p was too low.*" (Ex. El, Defs.' Resp.) (emphasis added). While sale price alone cannot demonstrate commercial unreasonableness, it has been treated as an important factor in the equation. *See, e.g., In re Estate of Sagmiller,* 615 N.W.2d 567, 569 (2000); *Dennison v. Allen Group Leasing Corp.,* 110 Nev. 181, 871 P.2d 288, 291 (1994).

Second, Defendants assert the wheel loader remained on New Holland's private list of offered equipment for over seven (7) months. Defendants assert this evidences New Holland's inadequate and untimely efforts to vigorously seek a private buyer. There may also be a lingering question of the physical condition of the wheel loader as a result of the time taken to bring it to auction.[4]

Third, Defendants challenge the auctioneer's offer for sale and the buyers to whom it was placed for disposition:

> Th[e auction] advertisement contains a long list of the equipment that was to be auctioned. The Defendants question how much interest the loader would attract, considering that it was one of hundreds of pieces of equipment listed, and the listing was buried somewhere in the middle of the advertisement. In hindsight, the Defendants wonder if the Plaintiff could have gathered a higher price if it had attempted to sell the loader to coal mine operators or other similarly situated businesses who use that type of equipment.

(Defs.' Resp. at 8.) The auctioneer avers the "wheel loader was one of more than 70 wheel loaders and track loaders of various makes and models that were offered for sale[.]" Aff. of Jeff Martin ¶ 5. The auction advertisement also reveals that while some of the wheel loaders are described as "new unused," "very nice," and "low hours," the subject wheel loader is merely listed by model and serial number.

All of these considerations demonstrate genuine issues of material fact remain on the question of commercial reasonableness. New Holland's motion for summary judgment on that issue is **DENIED.**[5]

On the issue of notice, White avers "I was not aware of the time or place that the loader could be purchased after it was surrendered." Aff. of Michael L. White ¶ 8. It appears Madison Creek and White were given notice only of a private sale. The advertisement for the sale where the loader was actually sold lists in large letters on its first page "PUBLIC AUCTION." If a public sale in fact occurred, the observations of some leading commentators become important:

> Even if the secured party's notice to the debtor contains information relating to all the items that the Code and courts require, that information may be incor-

---

4. On the other hand, New Holland "should be given ample opportunity to explore the prospects for a private sale if commercially reasonable to do so. Such is in the best interest of all involved." *In re Concord Coal Corp.,* 81 B.R. 863, 869 (S.D.W.Va.1988).

5. New Holland notes there has been no jury demand. If either party now seeks impanelment of a jury, the Court will entertain a motion pursuant to *Rule* 39(b), *Federal Rules of Civil Procedure.*

rect. Section 9–504 says that notice must be "commercially reasonable," but the Code is otherwise silent. *The most common example is a notice that leads the debtor to believe the creditor plans one type of sale (private or public), but the creditor holds the other type. Many courts hold that such a notice does not satisfy 9–504(3).* Some hold that unless the debtor can show fraud, bad faith, or actual damage, such a misstatement is immaterial.

*See, e.g.,* White & Summers, *infra* § 34–13(b) (citing cases); *see also* Ronald A. Anderson, *Anderson on the Uniform Commercial Code* §§ 9–504:596, 9:504:597 (3rd ed. 1999) ("The notice requirement of the Code is not satisfied when the creditor gives notice of one kind of sale but a different kind of sale is then made of the collateral. . . . No notice is given within the meaning of UCC § 9–504 when the creditor gives notice of a private sale but then holds a public sale of the collateral.") (citing cases); *Bank of America v. Lallana,* 19 Cal.4th 203, 77 Cal.Rptr.2d 910, 918, 960 P.2d 1133 (1998) ("When, as here, the creditor gives the debtor a notice of private sale but then holds a public sale, the creditor has not complied with the law."); *First Nat. Bank v. Jiron,* 106 N.M. 261, 741 P.2d 1382, 1384 (1987) ("Here, by giving notice of a private sale and then holding a public sale, the Bank deprived the Jirons of the opportunity to be present and bid at the sale and to encourage others to be present and bid, which is an important function of the required notice of a public sale."); *see also* Richard C. Tinney, Annotation, *Sufficiency of Secured Party's Notification of Sale or Other Intended Disposition of Collateral under UCC § 9–504(3),* 11 A.L.R.4th 241 (1982).

Given the parties' failure to brief this legal issue, which may have factual components also, the Court declines to the resolve the matter. The necessity and manner of briefing the issue will be discussed at the pretrial conference.

The Clerk is directed to send a copy of this Memorandum Opinion and Order to counsel of record via facsimile and to post a copy on the Court's website at http://www.wvsd.uscourts.gov.